# Dillard *v.* Webb.

*Detinue for Cattle Impounded.*

1. "*Canebrake Agricultural District;*" *character of corporation, and constitutionality of act establishing.*—The "Canebrake Agricultural District," as established by the act approved February 20, 1866 (Sess. Acts 1865-6, pp. 334-37), is a public, though not technically a municipal corporation, and has many of the attributes of a municipal corporation; and the title of the act creating it—"An act to establish the Canebrake Agricultural District, to provide for the securing of the same, and the management of its affairs"—indicates with sufficient precision its purpose and objects, and includes all the powers conferred by the act on the corporation.

2. *Impounding cattle taken damage feasant; constitutionality of law authorizing.* A statute which provides for the impounding of cattle taken damage feasant, and their sale if not redeemed after reasonable notice, is a police regulation within the scope of governmental powers, the exercise of which may be delegated to a municipal or other public corporation; and is not violative of the constitutional provision (Art. I, § 7) which declares that no person "shall be deprived of life, liberty, or property, but by due course of law."

3. *Constitutional amendment (14th) abolishing distinction on account of color.*—The provision contained in the 4th section of the act creating said corporation, which limits the right to vote at elections for commissioners to the *white* resident land-owners of the district, is abrogated by the 14th amendment to the constitution of the United States, since adopted, which abolishes distinctions on account of color, and has been repealed by legislative enactment; but this does not annul the entire section, nor invalidate elections held under it.

[Dillard v. Webb.]

4. *Election of corporate officers; validity of acts of officers de facto.*—If the validity of an election for officers or managers of a corporation is not assailed by a direct proceeding during their continuance in office, but they are permitted to act throughout their term as officers *de facto*, the legality of the next or any subsequent election can not be questioned on account of any vice or irregularity in the first.

5. *Appointment of pound-keepers.*—The power to establish pounds, and to appoint pound-keepers, conferred by the 13th section of the act creating said corporation on the board of commissioners, can not be delegated by them to the president; and an appointment by the president, being void, confers no power on the person appointed, and constitutes no defense to an action on account of his official acts.

6. *General objection to evidence.*—A general objection to a mass of evidence, some of which is legal, may be overruled.

7. *Boundaries of said district.*—The beginning and bearing points of the northern and southern boundaries of said district being designated in the charter, the commissioners have no power to change or depart from them, though they may ascertain and establish the lines between the designated points.

APPEAL from the Circuit Court of Marengo.

Tried before the Hon. LUTHER R. SMITH.

This action was brought by A. W. Dillard, against John C. Webb, to recover five head of cattle, together with damages for their detention; and was commenced on the 13th May, 1874. The only plea was *non detinet*, "with leave to give in evidence any matter that might be specially pleaded." The defendant had impounded the cattle on the 6th May, 1874, and, after public notice of the impounding, drove them into Demopolis, and there sold them, an hour or more after the writ in this case was served on him; and he defended the action on the ground of his authority as pound-keeper.

The material questions in the case arise out of the act establishing the "*Canebrake Agricultural District,*" which was approved February 20, 1866, and is entitled, "An act to establish the *Canebrake Agricultural District*, to provide for the securing of the same, and the management of its affairs. It consists of seventeen sections. The first section establishes the district in the counties of Greene, Perry, Dallas, and Marengo, "bounded as follows: Beginning at the Warrior river, near Erie, in the county of Greene, and running thence, by the way of Greensboro and Hamburg, to Fike's ferry on the Cahaba river, in Perry county, which will be the northern boundary thereof; and for the southern boundary, beginning at the city of Demopolis, and running thence, by the way of Spring Hill, Dayton, and McKinley, to the Alabama river near the town of Cahaba." The second section provides for an annual election of commissioners, with power to them to elect a president, "whose duty it shall be to preside at all meetings, and to do and perform all such other duties as may be required of him by said commissioners." The third section provides for filling vacancies in the board of

commissioners. The fourth enacts "that all white male persons, who shall be resident land-owners in said district, and of the age of twenty-one years, shall be deemed qualified voters" at all elections for commissioners. The fifth section requires a list of the commissioners, when elected, to be forwarded to the probate judge of each county in the said district. The sixth specifies the names of certain persons, who are authorized to act as commissioners until the first election is held. The seventh enacts, "that within said district no person shall be required to erect any fence or inclosure around his land, or keep the same in repair, or aid in the erection, construction, or repairs of any fence or inclosure, except as hereinafter provided." The eighth, "that within the boundary lines of said district there shall be constructed and erected one good and sufficient outside fence, or other good inclosure, with all such gates, bars, and outlets as may be necessary, so that all persons travelling into or out of said district, on the public or private ways, be not impeded or hindered ; *provided*, that on all public or private roads, leading into or out of said district, gates may be erected to prevent stock at large from trespassing therein." The ninth, "that the said commissioners shall have entire control over said fences or inclosures, and the gates, bars, and outlets thereon ; may direct where said fence shall be located and placed, how it shall be built, and, in general, superintend and direct all matters and things relating thereto." The tenth provides for the assessment and collection, by the Commissioners' Court of each of said counties, of a tax not exceeding two cents per acre on all the lands within the district, and a tax of not more than five dollars per mile on all railroads within the district ; and the next section provides, that the commissioners of the district shall expend this money, "or so much thereof as may be necessary, in erecting pounds, *and building fences or inclosures around said district, and keeping the same in good repair*, in paying for labor therefor, and such other necessary expenses as they may deem it expedient to incur in and about said district." , The twelfth section is as follows : " *Be it further enacted*, that within said district no person shall permit his or her stock, of any kind or description, to go at large ; and any domestic animal, of any kind or description, found at large, or trespassing, may be taken up, and carried to a common pound ; and the owner may reclaim the same, by the payment of such fees and compenstion as the said commissioners may in their rules and regulations establish, which they are hereby authorized and empowered to do, and also such damages as any person may have sustained by such animal going at large and trespassing." "*Sec.*

[Dillard v. Webb.]

13. *Be it further enacted*, that said commissioners shall establish a proper number of pounds, at convenient distances apart, for receiving all estrays and stock trespassing, or found at large ; fix upon such fees and compensation as they may deem proper for the receiving and keeping estrays and animals found trespassing ; appoint suitable persons to take charge of and keep up said pounds ; and adopt such rules and regulations as they may consider necessary for the government and management of the same." The fourteenth section authorized the commissioners " to appoint such superintendents and agents, for carrying into effect the provisions of this act, as they may deem necessary, and fix their compensation." The 15th section provided for the compensation of the commissioners ; the 16th gave them " power to pass all such by-laws, rules, and regulations, as they may deem necessary and proper for the management of their business"; and the 17th section repealed all inconsistent laws.—Session Acts 1865–6, pp. 334–37.

By a subsequent act, approved December 5, 1866, the 8th, 9th and 10th sections of this act were repealed, and the 11th section was amended by striking out the words which are italicized.—Session Acts 1866–7, p. 61. By another act of the same session, approved on the 25th January, 1867, the act was repealed, so far as it applied to Dallas county.—*Ib.* 210. By another act, approved January 2, 1872, the act of December 5, 1866, was repealed, and the sections repealed by it were re-enacted ; the 4th section was amended, by striking out the word *white* ; and the first section of the original act was amended, so as to read thus :  " That from and after the passage of this act, there shall be established in the counties of Hale, Perry, Dallas, and Marengo, a district to be called the " *Canebrake Agricultural District*,' bounded as follows : beginning at the point where Big Creek empties into the Warrior river, thence east, along the channel of said creek, to section six, township twenty-one, range four, east ; thence south, to the southwest corner of section nineteen, township twenty-one, range four, east ; thence due east, to the southwest corner of section twenty-three, township twenty-one, range four, east ; thence due south, to the road leading from Greensboro to Erie ; thence along said road, by way of Greensboro and Hamburg, to Fike's ferry on the Cahaba river, in Perry county, which shall be the northern boundary thereof ; and for the southern boundary, beginning at the city of Demopolis, and running thence, by way of Spring Hill, Dayton, and McKinley, to the Alabama river near the town of Cahaba." Session Acts 1871–2, pp. 335–37.

On the trial, as the bill of exceptions shows, when the de-

fendant offered in evidence the act incorporating the said *Canebrake Agricultural District*, the plaintiff objected to its admission, "because it was void for uncertainty in its boundary lines, and unconstitutional in its operation." The court overruled the objection, and admitted the evidence ; to which the plaintiff excepted. An admission in writing as to the testimony of C. L. Stickney, if present, as to the organization of the corporation, and the proceedings of the commissioners, was read in evidence ; stating, among other things, that said Stickney had been elected and had served as president of the board of commissioners from the organization of the corporation ; that in April, 1867, " said board established and defined the boundaries of said district, as appears by their published proceedings hereto attached, and, at the same time, adopted a resolution authorizing the president to establish pounds and appoint pound-keepers ; that on the 2d February, 1874, in pursuance and by virtue of said resolution, said Stickney, as president of said board, established a pound at the Winn place in Hale county, and appointed the defendant pound-keeper thereof, and sent him a commission," &c. The plaintiff objected to the admission of the proceedings of the board of commissioners establishing the boundary lines of the district, "because they fixed boundary lines inconsistent with those in the act creating the district ;" and to the admission of the proceedings in relation to the defendant's appointment as pound-keeper, " because a majority of the board was alone authorized to appoint pound-keepers." The court overruled the objections, and admitted the evidence ; and exceptions was reserved by the plaintiff to these rulings.

The plaintiff requested twenty-six written charges, all of which were refused by the court except two; and exceptions were duly reserved to their refusal. The opinion of this court renders it unnecessary to set out these charges at length. Most of them assert the unconstitutionality of the act establishing the *Canebrake Agricultural District*, on the grounds —that it is void for uncertainty; that it embraces matters not included in the title ; that it confers judicial powers on the commissioners ; that it provides for taking a man's property without due legal proceedings, &c. Some of them assert the proposition, in different forms, that the defendant had no authority, as pound-keeper, to drive the impounded cattle out of the district, and there sell them.

The rulings of the court on questions of evidence, to which exceptions were reserved, and the refusal of the charges asked, are now assigned as error.

W. W. DUGGER, for appellant.—1. In the absence of ex-

[Dillard v. Webb.]

press provision to the contrary, impounded cattle must be sold at the pound. The defendant had no authority to carry them out of the district for sale. He had as much right to take them to Mobile, as to drive them to Demopolis.—Hilliard on Torts, vol. 1, ch. 17, § 24, p. 488.

2. The establishment of the pound at the Winn place, and the defendant's appointment as pound-keeper, were both void. The powers exercised by the president, in relation to these matters, were by the charter conferred on the board of commissioners, and could not be delegated by them to the president, or to any one else. A delegated power cannot be delegated to some other person.

3. The act establishing the *Canebrake Agricultural District* is obnoxious to all the constitutional objections that were urged against its validity. The title does not include all the provisions of the act, and the act itself includes several distinct matters, having no necessary connection.—40 Ala. 99; 41 Ala. 9; 47 Ala. 65. Above all, the provisions authorizing the impounding of cattle, and their speedy sale if not redeemed, are violative of the constitutional provisions which are intended to guard and preserve private property.—*East Kingston, v. Towle,* 48 N. H. 398; 15 B. Monroe, 491; 58 Maine, 590; *Sadler v. Langham,* 34 Ala. 311; *Dorman v. The State,* 34 Ala. 216.

J. T. JONES, *contra.*—The material question in the case is, whether the 12th section of the act establishing the *Canebrake Agricultural District* is constitutional. If any other parts of the said act are unconstitutional, they are not so connected with this section as to affect its validity. The powers conferred by it fall within the police powers of government, which may be exercised by the legislature, or delegated by it to a public corporation.—Dillon on Municipal Corporations, § 93, note 1; Cooley on Const. Limitations, 572, 594.

STONE, J.—"Municipal corporations," says Mr. Dillon, "are bodies politic and corporate, * * established by law, to share in the civil government of the country, but chiefly to regulate and administer the local, or internal affairs of the city, town, or district, which is incorporated."—1 Dill. Mun. Corp. § 9 *b.*

"§ 10. Corporations intended to assist in the conduct of local civil government, are sometimes styled *political,* sometimes *public,* sometimes *civil,* and sometimes *municipal;* and certain kinds of them, with very restricted powers, *quasi* corporations; all these by way of distinction from *private* cor-

porations. All corporations, intended as agencies in the administration of civil government, are *public*, as distinguished from *private* corporations. Thus, an incorporated school district, or county, as well as a city, is a public corporation ; but the school district, or county, properly speaking, is not, while the city is, a *municipal* corporation.

" § 10 *a*. Civil corporations are of different *grades*, or *classes*, but in essence, or nature, they must all be regarded as public. The school district, or the road district, is invested with a certain corporate character, the better to perform within and for the locality its special function, which is indicated by its name."

In *Dartmouth College v. Woodward*, 4 Wheat. 636, Ch. J. MARSHALL said : "A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of the law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. These are such as are supposed to be best calculated to effect the object for which it is created."

In addition to powers expressly granted to corporations, they can exercise "such implied powers as are necessary and proper to carry into effect the powers expressly granted, and such *incidental* powers as pertain to the purposes for which the corporation was created. These implied and incidental powers are unwritten, and vary with the varying objects of the corporation."—*Intendant & Council v. Pippin*, 31 Ala. 550.

The act " To establish the Canebrake Agricultural District, to provide for the securing of the same, and the management of its affairs," approved February 20th, 1866, creates a public corporation, under the rules above declared. Though not technically a municipal corporation, it has much of the character and attributes of such corporation. Its name declares its purpose—namely, an association of persons, for the encouragement and promotion of agricultural pursuits, in what was and is known as the " Canebrake" region. It was intended to operate over a section of not inconsiderable dimensions, and hence it is called a " District." The term " agriculture " is defined to be " the art or science of cultivating the ground, especially in fields or large quantities, including the preparation of the soil, the planting of seeds, the raising and harvesting of crops, and the rearing, feeding, and management of live stock ; tillage, husbandry, and farming." The variety of products of the earth, of agricultural implements, and of domestic animals, invited and put on exhibition at agricultural fairs, attests the comprehen-

[Dillard v. Webb.]

siveness of the term, " agriculture." It refers to the field, or farm, with all its wants, appointments, and products, as horticulture refers to the garden, with its less important, though varied products.

We think the title of this act sufficiently discloses the subject—the growth, cultivation, and preservation of field crops; and that all the powers granted are cognate and incidental to the one controlling subject.—See *Adler v. The State*, and authorities cited, at the present term. Whether lands should be fenced; whether stock should be permitted to run at large, or should be kept in inclosures; and a speedy method of preventing the destruction of crops, if animals trespass upon them, are among the obvious inquiries and economics of successful agriculture.

2. It is further contended, that the provisions of this statute, which authorize the distress and impounding of cattle taken *damage-feasant*, are violative of the 7th section of the "declaration of rights," which declares that no person shall "be deprived of his life, liberty, or *property*, but by due course of law." This clause, with some modifications, has come down to us from MAGNA CHARTA, a period of over six hundred years.—See *Magna Charta*, .chap. 29. It was made a part of the constitution of the United States by Article V of the amendments, ratified December 15th, 1791. This clause is common to the State constitutions. It has always been held, that this constitutional guaranty does not prevent or impair the right of all sovereignties, or other inferior governmental organizations, having authority therefor, to establish sanitary and police regulations.—See Bacon's Abr. title *Distress* (F.) ; 3 Black Com. 12, *et seq.*; *Rust v. Low*, 6 Mass. 90 ; *Melody v. Reab*, 4 Mass. 471 ; *Mills v. Stark*, 4 N. H. 512.

Speaking of this right, Mr. Dillon, in his work on Corporations, § 93, says: "The citizen owns his property absolutely, it is true ; it cannot be taken from him for any private use whatever, without his consent, nor for any public use without compensation ; still, he owns it subject to this restriction, namely : that it must be so used as not to injure others, and that the sovereign authority may, by police regulations, so direct the use of it, that it shall not prove pernicious to his neighbors or the citizens generally.   *   *   It is not a taking of private property for public use, but a salutary restraint on a noxious use by the owner, contrary to the maxim, *Sic utere tuo ut alienum non lædas.*—Cooley's Const. Lim. 572, *et seq.*

It is clearly competent for the legislature to enact, or, by express authority, to delegate to a municipal, or other public

[Dillard v. Webb.]

corporation municipal in character, the right to enact, that fences shall be dispensed with; that cattle shall be kept within inclosures; that they may be distrained, if found at large damage-feasant; that they may be impounded, and if, after reasonable notice, they be not redeemed, and the reasonable damages and expenses paid, that they be sold therefor.—Dill. Corp. §§ 101, 270, 282; *Mills v. Stark*, 4 N. H. 512; *Rust v. Low*, 6 Mass. 90. The question of requiring or dispensing with fences, requiring cattle to be confined, or permitting them to run at large, is one of unquestioned police regulation, and clearly within the power of the sovereignty. Almost all cities and large towns have ordinances forbidding cattle to run at large, providing pounds, and authorizing sales to meet expenses; and they are necessary to the comfort and well-being of the municipality. It is only when such ordinances fail to protect the rights of the owners of the cattle, or fail to furnish them the means of relieving them by paying the proper charges, or when the regulations are not complied with, that the law withholds its sanction. All such proceedings are *stricti juris*; and both the by-law or ordinance, in its terms, and the officer in its execution, must accord to the property-owner all his substantial rights.

Under the present charter, there is no want of power. The 12th section of the act declares: "That, within said district, no person shall permit his or her stock, of any kind or description, to go at large; and any domestic animal, of any kind or description, found at large, or trespassing, may be taken up, and carried to a common pound; and the owner may reclaim the same, by the payment of such fees and compensation as the said commissioners may in their rules and regulations establish, which they are hereby authorized and empowered to do, and also such damages as any person may have sustained by such animal going at large and trespassing."

The 13th section authorizes the establishment of pounds; the 14th, the appointment of pound-keepers; and the 16th declares, that the "commissioners shall have power to pass all such by-laws, rules and regulations as they may deem necessary and proper for the management of their business." The extent of power conferred by these general words is shown in the case of *Intendant & Council v. Pippin, supra*. The adoption of suitable by-laws, to carry into effect the provisions of said section 12, was and is clearly within the purview of their powers, expressly conferred.

3. That portion of the 4th section of the act of incorporation, which makes a discrimination on account of color, is violative of the fourteenth amendment of the constitution of

the United States. When that amendment was ratified—July 28th, 1868—the distinction on account of color was necessarily abrogated. It is contended that this operated a repeal of the entire fourth section of the act, and avoided all elections held from time to time afterwards. The word *white* was struck from this section by the act approved January 2d, 1872; but the point of the argument is, that in the transition, one set of commissioners must have been chosen at an election held by persons not legally elected, and that this invalidated the election thus conducted. From this the conclusion is attempted to be drawn, that the persons assuming to act as commissioners in February, 1874, when the pound at the "Winn place" was established, and Webb appointed the keeper thereof, were not legal officers; that the whole proceeding was irregular, and that it conferred no legal authority on Webb.

We are not informed by the record in what manner the elections for commissioners were conducted, after the fourteenth amendment became operative: whether the elections were made solely by white male persons, resident landowners in the district, or whether the color-line was regarded as obliterated. If, in the conduct of the elections, the ballot was accorded alike to white and colored land-owners, such election, properly conducted, would stand the test of the severest judicial scrutiny, even when assailed by a direct proceeding for that purpose. In popular elections, held at the time and place, and by the officers required by law, the main inquiry is, in whose favor was a majority of legal votes cast? The statutory expressions as to all other questions are more or less directory.—See Leading Cases on Elections (*Boileau's case*), 270; *State, ex. rel. v. Judge 9th Cir.*, 13 Ala. 805; Cooley Const. Lim. 623. This question, however, is not before us, for no direct proceeding was instituted to test the legality of the election.

4. The persons exercising the functions of commissioners were certainly *de-facto* officers; and that is enough to render their acts valid, when collaterally presented.—2 Brick. Dig. 289–90, §§ 18, 19, 20. In the case of *Commonwealth v. Smith*, 45 Penn. St. 59 (*S. C.* Leading Cases on Elections, 274), it is said: "If an election for managers of a corporation be not disputed during their term of office by *quo warranto*, and they be permitted to act throughout their term as officers *de facto*, the legality of the next election can not be questioned for any vice or irregularity in the first." Under this rule, which has our sanction, each successive set of commissioners would, in any event, become officers *de facto* of the corporation, and their acts, when collaterally presented, would

[Dillard v. Webb.]

be pronounced valid. The legal right of only one set could be questioned, which must be done by a direct proceeding, and during the continuance of the particular term in which they were acting under claim of election. The acts of the board of commissioners, in establishing a pound on the "Winn place," and in appointing the appellee to be the keeper thereof, can not be avoided by any irregularity in the conduct of the election under which the commissioners claimed to act.

5. It is contended, however, that the pound on Winn's place was established, and Webb appointed keeper thereof, by Stickney, the president, and not by the board of commissioners, as required by the 13th section of the charter, which declares, "that said commissioners shall establish a sufficient number of pounds, at convenient distances apart," and shall "appoint suitable persons to take charge of and keep up said pounds." These duties, we think, require the action of the board of commissioners, and they can not be delegated to one of their number. *Potestas delegata non potest delegari. Craig v. Burnett,* 32 Ala. 728; Dil. Mun. Corp. § 60.

The witness Stickney says, he, "as president of said board, established a pound at the Winn place, in Hale county, and appointed J. C. Webb pound-keeper thereof, and issued and sent to him the commission" attached to the bill of exceptions as "Exhibit C." The commission thus attached reads as follows:

"Greensboro, Ala., Feb. 2d, 1874. To J. C. Webb: A pound is hereby established at the Winn place in Hale county, Ala., and you are hereby appointed pound-keeper thereof, by order of the board of commissioners of the Canebrake Agricultural District. C. L. STICKNEY, pres. of board."

The board, at its meeting in April, 1867, had resolved, "That the president of the board of commissioners of the Canebrake Agricultural District shall have the power to establish pounds and appoint pound-keepers in localities, when petitioned by the residents to do so." The record discloses a petition, bearing several names, addressed to C. L. Stickney, asking the establishment of a pound at Winn's place, and the appointment of Webb as pound-keeper. There appears to have been an entry on the minutes of the board, as follows: "Application for pound by John C. Webb, granted, Jan. 8, 1874."

This evidence is clear and undisputed. It shows that the establishment of the pound, and the appointment of the keeper thereof, were done by the president, and not by the board. The bill of exceptions informs us, that it contains all the evidence; and what we have stated above, is all that

[Dillard v. Webb.]

bears on this question. This all points in one direction, and it left the jury no room for doubt in their finding as to this fact. It was permissible and proper to state it without hpyothesis; for this was only charging on the effect of the evidence bearing on this question. The court might have instructed the jury, and should have done so, if thereto requested in writing, that there was no evidence before them, authorizing the defendant to seize, impound, or sell the cattle of plaintiff.

The 14th charge asked and refused is in the following language : " If the jury believe, from the evidence, that the defendant (Webb) found plaintiff's cattle (sued for) on his oats, and that said Webb pounded said cattle upon his lot, and five (5) days afterwards drove them, or caused them to be driven, to Demopolis, for the purpose of selling them ; and that while said cattle were in Demopolis, plaintiff caused the writ in this action to be served on defendant,—then any commission to said Webb, as pound-keeper on the Winn place, issued and directed as adduced in evidence by defendant, will not prevent a recovery in this case." This charge simply postulates a set of facts, within the purview of the evidence, that would give to plaintiff a *prima facie* right to recover, and then affirms the invalidity of Mr. Webb's commission, as a justification for the detention of the property. It should have been given.

We do not think the Circuit Court erred in refusing the other charges asked, but we deem it unnecessary to pass them in review, and point out the varying reasons. To do so, would swell this opinion unnecessarily. The questions presented by them will not probably arise on the next trial.

6. The objection to the evidence given by the witness Stickney, was only general, to a mass of evidence, much, if not the whole of which, was legal. The grounds stated for the objection were but the specification of reasons for excluding the whole of his testimony. Such objection, and exceptions furnish no ground for reversal.—1 Brick. Dig. 558, § 122. The other objection to the introduction of evidence were not well taken.

7. One other point raised by this record, we feel it our duty to notice. The charter of the " Canebrake Agricultural District" designates certain beginning and bearing points for both the northern and southern boundaries of the district. These the commissioners have no power to change or depart from. The latest expression of the legislative will on this subject is a law to them, which they cannot disregard. Between the designated points in the boundaries, they may ascertain and establish the lines. They can not change the

beginning points, nor deflect so as not to touch the named places.

For the single error above pointed out, the judgment of the Circuit Court is reversed, and the cause remanded.