JORGENSON, APPELLANT, v. STORY ET AL., RESPONDENTS.

(No. 6,031.)

(Submitted January 11, 1927. Decided March 12, 1927.)

[254 Pac. 427.]

*Conversion—Livestock—Impounding Under Herd Law—Stat-
ute — Strict Construction — Failure to Give Proper Notice
—Illegal Sale—Estrays.*

Conversion — Livestock — Impounding — Herd Law—Strict Compliance
With Provisions Required.
    1.  The provisions of the Herd Law (sec. 3348 *et seq.* Rev. Codes
1921) must be strictly followed in order to afford protection to
those responsible for the impounding and sale of animals under
its authority, and where they are not so followed, the taking
constitutes a taking of private property without due process of
law (sec. 27, Art. III, Constitution) and a conversion of the
property.

Same — Impounding of Livestock — Failure to Give Proper Notice —
Taker Liable to Owner.
    2.  Where defendants in an action for the conversion of livestock
after impounding cattle knowing their owner kept them in their
possession for more than a month before attempting to give the
notice required to be given by the Herd Law within forty-eight
hours, and sold them in disregard of its provisions, they were
guilty of a conversion and a judgment in their favor was un-
warranted.

Statutory Liens — Failure to Observe Requirements of Law — Wrong-
doer Trespasser *Ab Initio.*
    3.  A party who seeks to justify the taking of another's property
under legal authority (as by impounding cattle running at large)
must show that he had acted strictly in conformity with the re-
quirements of the Herd (or Estray) Law, otherwise he will be
held a trespasser *ab initio.*

Livestock—What are not Estrays.
    4.  Under the statute governing estrays the animals must be
wandering or running at large and their owner must be unknown
to the person taking them up; hence where they are in the pub-
lic highway in charge of a person they are not estrays.

    [1]  Animals, 3 C. J., sec. 630, p. 183, n. 42 New; sec. 638, p. 185,
n. 76; sec. 645, p. 186, n. 16 New.
    [2]  Animals, 3 C. J., sec. 638, p. 185, n. 76; sec. 641, p. 185, n. 84;
sec. 650, p. 187, n. 29. Liens, 37 C. J., sec. 68, p. 342, n. 62.
    [3]  Animals, 3 C. J., sec. 645, p. 186, n. 16. Trespass, 38 Cyc.,
p. 1067, n. 79.
    [4]  Animals, 3 C. J., sec. 610, p. 179, n. 73, 74; sec. 633, p. 183, n. 53.

    3.  Validity of statute authorizing seizure and sale of trespassing
stock, see note in 6 A. L. R. 230. See, also, 1 R. C. L. 1149.

*Appeal from District Court, Stillwater County; H. J. Miller, Judge.*

ACTION by Anna M. Jorgenson against W. D. Story and others. From a judgment in favor of defendants, plaintiff appeals. Reversed and remanded for new trial.

Cause submitted on briefs of Counsel.

*Mr. W. L. A. Calder,* for Appellant.

*Mr. M. L. Parcells* and *Messrs. Johnston, Coleman & Johnston,* for Respondents.

Written notice to plaintiff of the impounding of the stock was unnecessary, and the verbal notice given in this case was sufficient. Section 4, Chapter 167, Laws of 1919, page 321, provides: "If the owner of said stock, or the person entitled to the possession thereof, can be found or is known to the person taking up said stock, it shall be his duty to notify said owner, owners, or persons in charge thereof in person within forty-eight hours after taking possession thereof by leaving a written notice at his usual place of residence with some member of his family," *etc.* Two clauses of the statute above are in conflict with each other. The first clause is as follows: "It shall be his duty to notify said owner, owners or persons in charge thereof in person." The other clause is: "By leaving a written notice at his usual place of residence with some member of his family over the age of fourteen (14) years." It is manifestly impossible to construe each of these clauses literally for they are in direct conflict. A notice to the owner in person must be made to him individually, and to nobody else.

Apparently the legislature in enacting this section of Chapter 167 of the Laws of 1919 inadvertently omitted the word "or," and the law should read as follows: "It shall be his duty to notify said owner, owners or persons in charge thereof

in person within forty-eight hours after taking possession thereof, *or* by leaving a written notice at his usual place of residence with some member of his family over the age of fourteen (14) years." Such a construction harmonizes these two conflicting clauses, makes the statute reasonable and evidently carries out the intent and purposes of the legislature. This is made doubly certain by referring to section 5 of Chapter 74, Session Laws of 1917, which was amended by section 4 of Chapter 167. In section 5 of the Laws of 1917 the law reads: "It shall be his duty to notify said owner or owners in person *or* by leaving a written notice at his usual place of residence with some member of his family over the age of fourteen (14) years."

It is the duty of the court in construing a statute to reconcile, if possible, conflicting provisions or clauses of the law, so as to make them consistent and harmonious. (36 Cyc. 1128, 1129; 25 R. C. L., secs. 247, 1008.) Words may be inserted when necessary to avoid repugnancy or inconsistency and to give effect to the manifest intent of the legislature. (25 R. C. L. 976, sec. 225, and cases cited; 36 Cyc. 1127.) This court has held that if a word was inserted in the statute through inadvertence, it should be disregarded in construing the statute. (*Rose* v. *Sullivan*, 56 Mont. 480, 185 Pac. 562, 563; *Shapard* v. *City of Missoula*, 49 Mont. 269, 276, 141 Pac. 544.) The same rule would no doubt apply to the insertion of words omitted by inadvertence and necessary to reconcile apparently conflicting clauses and make different parts of the law harmonious and consistent.

Even where written notice is required by the law, verbal notice is sufficient if the owner acts upon such verbal notice, or if the owner has actual knowledge of all of the information to be given him by the written notice. (*Norton* v. *Rockey*, 46 Mich. 460, 9 N. W. 492, 493; *Parks* v. *Kerstetter*, 113 Mich. 520, 71 N. W. 865; *Hanscom* v. *Burmood*, 35 Neb. 504, 53 N. W. 371; *Schroaf* v. *Allen*, 12 Neb. 109, 10 N. W. 551; *Moore* v. *Robbins*, 7 Vt. 363.)

MR. JUSTICE GALEN delivered the opinion of the court.

This action was instituted by the plaintiff to recover damages from the defendants for the alleged conversion of certain personal property. From a judgment entered in favor of the defendants the plaintiff has appealed.

There is little conflict in the evidence. Therefrom it appears that the plaintiff, a widow, in poor financial circumstances, and her two minor children, a boy and a girl, resided at the village of Park City. She earned her living by taking in washing and doing housecleaning, and owned and possessed a milch cow and calf; the milk obtained from the cow being of assistance to her in the support of herself and children. Her place of abode was adjacent to land belonging to school district No. 5, upon which latter land a public schoolhouse was constructed and maintained, and contiguous to a certain tract of ground upon which her nearest neighbor, John H. Betz, "the preacher," resided, and in connection with his residence maintained a small vegetable garden. A herd district had been regularly created by the board of county commissioners of Stillwater county on the fifth day September, 1917, pursuant to the provisions of Chapter 74 of the Laws of 1917, and amendatory Acts, prohibiting cattle from being permitted to run at large within the territory embraced in the district, which included the village of Park City.

The defendant Levi Colgrove, a common laborer, resided in Park City, and on June 23, 1920, by an instrument in writing, was designated by the persons signing the same, as poundmaster. The appointment so made reads as follows: "Park City, Montana, June 23, 1920. We, the undersigned property holders of Park City, Montana, do hereby appoint Levi Colgrove as our agent and authorize him to take and empound any stock found trespassing on our property as described below. Name. Property Description." This written designation of Colgrove, as such agent, is subscribed by eighteen persons, after the name of each of whom is given a de-

scription of their property holdings in Park City. It was signed by the defendant W. D. Story, personally and as "Chairman School Board."

Adjoining the plaintiff's residence she owned land upon which she maintained a corral and barn for the care of her cattle. On the evening of August 23, 1920, at about 5 o'clock, a little girl who was staying at the house of her neighbor, Mr. Betz, came to the plaintiff's house and advised the latter that her cow was out. Thereupon the plaintiff directed her daughter, Irma, "to go and get both the cow and the calf," stating that she "would herd them until Carl [her son] came home from work." The plaintiff in this connection testified: "I herded them for awhile, and in the meantime passed Mr. W. D. Story on the street. He was there and saw me herding the stock. Finally, my daughter came out and herded the stock for awhile, relieving me.  *  *  *  The cow when she was filled up, following her usual custom, went to the barn. My daughter closed the gate and stood leaning on the gate. Instead of going to the house I began to pick some gooseberries and watched my girl to see if she closed the gate, as there was only one gate at this time through which we could get into these lots. We stayed there watching the cow and calf playing, and then my girl started to go home, half a block away." Her son was working on the railroad section and come home that evening about one hour later than usual, some time between 7 and 8 o'clock. She testified: That when the boy came home "we went out to milk. When we came to where the cow should be she was gone. My boy looked all around the fences. We could not find the fence down anywhere. My boy went to Mr. Betz's back door and on the porch and I stood out on the street, and he said, 'Mr. Betz, have you seen our cow?' I could hear what was being said where I stood. Mr. Betz said, 'Yes; I have her in the barn.' My boy said, 'Where did you get her?' Mr. Betz said, 'In my garden.' My boy said, 'How much do you want?' Mr. Betz said, 'I do not know. I have to see Colgrove and Stoltz first.' Then I said, 'Do not quarrel with

him.' The next time I had any conversation with one of these defendants relative to the cow was early next morning, with Mr. Colgrove. He came to the house about 7 o'clock. My daughter went to the door, and he spoke very pleasantly to her, and I appeared in the door. As he looked up at me he said, 'You damned bitch, I want $2.' I said, 'What do you want $2 for?' He said, 'I want it for the preacher.' I said, 'What does the preacher want with it?' He said, 'He claims damages against your cow.' I said 'Where is my cow?' Mr. Colgrove said, 'In the barn.' I said, 'How come she to be in the barn?' He said, 'The preacher put her there.' I said, 'Did that preacher milk my cow?' Mr. Colgrove said, 'I did that myself.' I said, 'Did you keep the milk, Mr. Colgrove?' He said, 'Yes.' I said, 'Have you got a warrant for me?' Mr. Colgrove said, 'No.' I said, 'Mr. Colgrove, you came through two gates. See how fast you can get out of them and close my door.' About an hour later Mr. Colgrove and Mr. Betz came to my house. * * * One of them rapped at the door and I opened it. Mr. Colgrove * * * said, 'There is a heavy charge at the barn. Whenever you pay that you can have your cow,' I said, 'At what barn?' He said, 'At the livery barn.' " Colgrove then explained to her that the cow was being held because of having trespassed on Mr. Betz's garden. Plaintiff further testified: "I said, 'Are you positive and sure that that man got my cow in his garden?' Mr. Betz said, 'I think I did.' "

In the evening after the cow was so taken by Mr. Betz, she was turned over to the defendant Colgrove, who impounded her at the "Headquarters barn." On the morning of August 24, 1920, after the cow was taken up by her neighbor Betz, the plaintiff's daughter tethered the calf to a tree by a chain about fifty feet in length. The defendant Colgrove, observing the calf so picketed and grazing on the school grounds between the hours of 10 and 11 that morning took it with the chain attached to it to the barn where the cow was held and impounded it with the cow.

On the day the calf was taken away, in the evening of August 24, between 9 and 10 o'clock, the plaintiff, accompanied by her two children, visited the barn where her cattle were held, and there they met Mr. Colgrove. The plaintiff's boy said to Mr. Colgrove: "Will you turn the cow over to me so mother can have the milk?" Mr. Colgrove replied: "Whenever you give me $1 for that man and some money for my trouble; $1 for my trouble and some money for Mr. Sorlie; * * * not until then." The plaintiff's daughter then said: "Mr. Colgrove, I wish you would turn that calf over to me immediately." Mr. Colgrove replied: "Whenever you pay for it; not until then." The plaintiff then said: "Mr. Colgrove, would you at any price turn that stock over to either of us three?" Mr. Colgrove said: "No."

The defendant Colgrove, as a witness, denied that in addressing the plaintiff he had said, "You damned bitch, I want two dollars." He admits that on the evening of the day the calf was impounded by him the plaintiff and her two children called at the barn where the cattle were held "after their cow and calf," but denies that he then or at any other time said to the plaintiff that he would not give up the stock at any price. He testified: "I said: 'You can have them. There is $1.50 on the cow, and there is .50 feed bill to William Story, and there would be $1 on the calf. It would be $2.50.' I did not say: 'I want some money for Mr. Betz and some for myself and some for William Story.' All I asked for at that time was $2.50. I did not at that time say to Mrs. Jorgensen: 'I will not turn the stock over for any money.'"

Both the cow and the calf were kept and held by Colgrove, first at the Headquarters barn for a couple of days, and thereafter at William Story's barn, until they were sold at public auction on the afternoon of November 20, 1920.

No written notice of the impounding of the cattle was given or attempted to be given to the plaintiff until October 1, 1920, and on or about that date the plaintiff received through the

mail a letter written by the defendant Colgrove, in words and figures as follows:

"Park City, Montana, October 1, 1920. Mrs. Anna M. Jorgenson, Miss Mamie Jorgenson, City—Madam: There are the following bills against your cow and calf which were impounded August 24, 1920, while running at large in a lawfully created herd district.

| | |
|---|---:|
| Impounding fee | $ 2.00 |
| Damage, John Betz | 1.00 |
| Feed bill | 39.00 |
| Total | |

"If this amount is not paid to the undersigned by noon, October 5, 1920, the animals will be turned over to the stock inspector to be sold for costs accrued and any residue over and above said costs will be returned to you. Yours truly, Levi Colgrove, Deputy Sheriff."

Later, on October 16, 1920, the plaintiff found at the door of her house a notice in writing, reading as follows: "To Anna M. Jorgenson, Carl Jorgenson, and Mamie Jorgenson, Park City, Montana, the owners or reputed owners or persons in charge of stock hereinafter described. You will please take notice that your calf has been trespassing upon the property of school district No. 5, Park City, Montana, and your cow has been trespassing upon the property of John H. Betz, described as lots 10, 11, and 12 of the village of Park City, Stillwater County, Montana, and have caused damage to the property of the school district in the sum of $1 and to the property of John H. Betz in the sum of $1. The undersigned school district has taken up one heifer calf, and the undersigned John H. Betz has taken up one Jersey cow, and said animals are being held by the undersigned as security for the payment of such damages and reasonable charges for the care of said animals while in the possession of the undersigned, pursuant to the provisions of the Herd Law. You and each of you are further notified

to, within forty-eight hours after receipt of this notice, pay the damages in the sum of $1 for each animal as hereinbefore stated and the sum of $27 for each of said animals for care while in the possession of the undersigned and a further sum of $1 for each and every day the said animals so remain in charge or possession of the undersigned. Dated this 15th day of October, A. D. 1920. School District No. 5, Stillwater County, Montana, By W. D. Story, Chairman. John H. Betz.''

On the morning of November 5, 1920, the plaintiff found a second notice in writing at her door, which reads as follows:

"*Notice of Auction Sale.*—To be sold at public auction on the 10th day of November, A. D. 1920, at 2 o'clock p. m., at the Storie Livery Barn in Park City, Montana, unless redeemed prior to that time: One Jersey cow; one Jersey heifer calf—for damages done to the property of school district No. 5 by said calf, amounting to one ($1.00) dollar, and to the property of John H. Betz by said cow, amounting to one ($1.00) dollar, as well as for charges for the keeping and feeding of said cow and calf, amounting to the sum of forty ($40.00) dollars for each of said animals, or an aggregate amount of forty-one ($41.00) dollars each, in addition to which costs and charges of making said sale will be added. Dated this 26th day of October, A. D. 1920. School District No. 5, Stillwater County, Montana, by W. D. Story, Chairman. John H. Betz. Wm. Storie. Levi Colgrove, Agent.''

The notice last set forth was also published on November 5, 1920, in the one issue of that date of the "Park City Pioneer," a newspaper published at Park City.

The plaintiff was in attendance upon the sale of the cattle as noticed. Numbered among the bidders were the defendants Story, Colgrove and Betz. Colgrove made purchase of the calf at the sale. The cow and calf brought $77 at the sale, which was not sufficient to pay the charges against them, and the plaintiff received no part of the money paid for them. From the time the cattle were first impounded, all of the defendants were conversant with the facts.

There is no evidence whatsoever in the record indicating that the cow or calf had ever before been troublesome in the community, or that they had theretofore trespassed on anybody's property or given any annoyance to any residents of the community, nor that they had ever been before impounded or attempt made to impound them.

The cause was tried to a jury, and at the conclusion of all of the evidence, by agreement of counsel for the respective parties, the jury was discharged and the cause submitted to the court on the theory that the case involved only questions of law. The court thereafter made findings of fact and conclusions of law against the plaintiff upon which the judgment was entered. It was concluded by the court, as a matter of law, that the animals were legally impounded; that due and legal notice thereof was given to the plaintiff within the time and in the manner provided by law; that the plaintiff made no legal demand upon the defendants or any one of them for the return of the cow and calf, or either of them; that the plaintiff was not legally entitled to the return of either of the animals because of failure to comply with the statute; that the animals were sold at public auction after notice of such sale had been given in manner as required by law; and that the plaintiff is not entitled to recover judgment against the defendants.

The plaintiff's assignments of error all relate to the court's findings of fact and conclusions as to the law, but one of which need be considered in disposition of this appeal, *viz.:* Did the court err in failing to find as a matter of law, from the facts, that the defendants were guilty of having converted the plaintiff's property?

The case was presented, tried and determined by the court on the theory that the "Herd Law" is controlling as to the rights of the parties, and it was so presented to this court. Accordingly, we shall consider and decide this appeal on the same hypothesis.

The statutory provisions in effect governing herd districts
[1] at the time this controversy arose, so far as applicable,
provide: "All horses, mules, cattle, sheep, and goats are
hereby prohibited from running at large within herd districts.
\* \* \* " (Sec. 3385, Rev. Codes 1921.)

Section 3386 provides: "If any such animal or animals,
wrongfully enter upon premises within such district of any
person, the owner or person in control of such animal or ani-
mals shall be liable for all damages sustained thereby to the
party entitled thereto. The owner or occupant of the land
upon which such wrongful entry is made may take into his
possession such animal or animals and shall reasonably care
for the same while in his possession, and may retain possession
of said animal or animals, and shall have a lien and claim
thereon as security for payment of such damages and the rea-
sonable charges for the care of said animal or animals while
in his possession. If the owner of said stock, or the person
entitled to the possession thereof, can be found or is known
to the person taking up said stock, it shall be his duty to no-
tify said owner, owners, or persons in charge thereof in per-
son, within forty-eight hours after taking possession, thereof,
by leaving a written notice at his usual place of residence with
some member of his family over the age of fourteen years, de-
scribing said stock and stating the amount of damages claimed,
and requiring him within forty-eight hours after receiving
said notice to take the said property away, after making full
payment of all damages and costs of trespassing animals.
Upon demand, the owner or occupant of the land shall re-
lease and deliver possession of such stock to the owner or per-
son entitled thereto, upon payment of such damages and charges,
and if the parties cannot agree upon the amount of such dam-
age and charges, the owner or person entitled to said stock shall
issue a receipt to the owner or occupant of the land having pos-
session of such stock, which receipt shall fully describe the ani-
mal or animals so that they may be at any time identified, and
shall thereupon be entitled to the possession of such stock.

"The owner or person so receiving · possession of said stock shall not dispose of the same, but shall retain and hold the same in his possession as the agent and legal custodian thereof for the party entitled to such damages and charges. The party entitled to such damages or charges shall, within ten days after delivery of possession of such stock, commence an action in any court having jurisdiction, to recover such damages and charges, and summons in such action shall be immediately served. At any time after such action is commenced, the owner or person entitled to said stock to whom delivery of possession was made, may furnish and file a bond conditioned to pay the damages and charges, and upon the approval of said bond by the justice of the peace, if such action is commenced in a justice court, or by the judge or clerk, if the action is commenced in the district court, the lien and claim upon said stock shall thereupon be discharged.

"If the owner or person entitled to said stock does not furnish such bond within ten days after the notice of the commencement of said action, an order may be issued in such action, authorizing and directing the constable or sheriff to take possession and hold such stock to satisfy any judgment that may be recovered in such action, and such stock, when so taken possession of by the officer, shall be held, treated, and sold the same as though seized under a writ of attachment. * * *

"When the ownership of such stock cannot be determined as provided by sections 3333 to 3337 of this Code, said stock may be sold as provided therein, and from the proceeds thereof damages and costs shall be paid in the manner herein provided, with the stock inspector acting as agent of the owner."

This law was originally enacted in 1917 (Chap. 74, Laws 1917) and amended by Chapter 167 of the Laws of 1919. As amended, it was carried forward by the Code commissioner into the Codes of 1921, and constitutes the law applicable, although portions of the Act of 1917, neither amended nor re-

pealed, were omitted from the codification.  (Sec. 17, Rev.
Codes 1921; and see, also Chapter 54, Laws of 1925.)

This statute is designed to prohibit livestock from *"run-
ning at large"* within regularly created herd districts, and
by its terms, where any animal or animals wrongfully enter
upon premises of any person within such district, "the owner
or person in control of such animal or animals shall be liable
for all damages sustained thereby to the party entitled
thereto."  The owner or occupant of the land trespassed upon
is authorized to take such animal or animals into his posses-
sion and reasonably care therefor, "and may retain possession
of said animal or animals, and shall have a lien and claim
thereon as security for payment of such damages and the rea-
sonable charges for the care of said animal or animals while
in his possession."  When the owner of such animal is known
or can be found, it is made the duty of the person impound-
ing such animals, within forty-eight hours, to personally no-
tify the owner, or person in charge thereof, "by leaving a
written notice at his usual place of residence with some mem-
ber of his family over the age of fourteen years, describing
said stock and stating the amount of damages claimed, and re-
quiring him within forty-eight hours after receiving said no-
tice to take the said property away, after making full pay-
ment of all damages and costs of trespassing animals."  The
person impounding such trespassing livestock is given a rem-
edy for the recovery of the damages and costs by him sus-
tained, where the owner thereof is known, by a civil action to
be commenced in a court of competent jurisdiction.  And it
is only where the ownership of such livestock is unknown or
cannot be determined that they are authorized to be sold sum-
marily as estrays, after the giving of the notice prescribed,
and the statute provides that: "The term 'estray' shall mean
any mare, gelding, stallion, colt, foal or filly, mule, jack, jen-
net, cow, ox, steer, bull, stag, heifer, or calf, which is running
at large away from its accustomed range, or any animal as

above described, the owner of which cannot with reasonable diligence be found." (Sec. 3339, Rev. Codes 1921.)

Here there was no apparent effort made to comply with the statute in the disposition of the plaintiff's cattle. Her owner-
[2] ship of the animals was well known to the defendants, yet they failed to notify her in writing within forty-eight hours after the cattle were impounded. The defendant Colgrove kept possession of the cattle over her protest for more than a month before attempting to follow the requirement of the statute that she be served within forty-eight hours in manner prescribed with a written notice of the fact that the animals were impounded and the damages claimed. On November 5, seventy-four days after the cattle were taken up by the defendants, a written notice of the sale thereof was left at the plaintiff's door, and a copy published in one issue of the "Park City Pioneer," a newspaper published at Park City, five days prior to the time set for the sale. Such procedure in no way complies with the Herd Law, or the enactment concerning estrays as will be observed upon the most superficial reading of them.

From a reading of the statute it is manifest that its provisions were not followed. Therefore it is not available to the defendants as a defense in this action.

Our own Constitution (sec. 27, Art. III) prohibits the taking of private property without due process of law; and the provisions of statutes such as our Herd Law must be strictly followed in order to afford protection to those responsible for the taking and disposal of another's property under its authority.

"The right of a person to acquire, hold, and protect property; to be secure in his possession of it against unreasonable seizure; and to retain it until deprived of it by due process of law, is, as among English speaking people, as old as the common law itself. Its origin antedates by many years the guaranty contained in the Magna Charta. The right itself was the inheritance of our people who inhabited the territory ac-

quired from Great Britain at the close of the Revolution, and was adopted by the people of the territory of Montana by its First Legislative Assembly, and was continued in force thereafter. It is now embodied in the Bill of Rights, Article III, of our state Constitution." (*Herlihy* v. *Donohue,* 52 Mont. 601, 161 Pac. 164.)

No person can be deprived of his property except by due process of law, and the taking and disposal of the property of another, as was done in this case, is not "due process of law" within the meaning of that expression as used in the Constitution of the state and of the United States. This Act is drastic, and is to be construed most strictly against a person who deprives another of his property under its authority. The Act provides that the person taking up livestock under its provisions must bring an action against the owner within six months to recover damages done by trespassing livestock. This course was not pursued by the defendants. They merely held the plaintiff's property until the costs and charges equaled the value of the property and then summarily disposed of it. Such course is neither authorized nor justified by the Act. It amounted to a conversion of the plaintiff's property.

Such statutes are strictly construed, and one claiming immunity from damages for the conversion of the property of another must show that the requirements of the law have been closely observed. The rule is that a statutory lien may be enforced on property only in the manner prescribed by the statute, and it is the duty of one selling property in satisfaction of his lien to comply strictly with its requirements. (16 Cal. Jur. 352.) And a person who claims a lien on an animal for having taken it up as an estray must show a full and strict compliance with every requirement of the statute creating such a lien. (*Mills* v. *Fortune,* 14 N. D. 460, 105 N. W. 235.)

The statute is a police regulation and all proceedings under it are *stricti juris,* in accordance with the established principle that, when by statute a special authority is given to par-

ticular persons, affecting the property of· individuals, it must
[3]  be strictly pursued.  The language of the authorities is
that a party who justifies the taking of another's property,
under legal authority or process, must show that he has acted
strictly in conformity with the requirements of the law; other-
wise, he will be considered a trespasser *ab initio*. (*Home
State Bank* v. *Swartz,* 77 Mont. 566, 252 Pac. 366; *Chaffee* v.
*Harrington,* 60 Vt. 718, 15 Atl. 350; *Coffin* v. *Field,* 7 Cush.
(Mass.) 355; *Strauser* v. *Kosier,* 58 Pa. 496; *Dierks* v. *Wie-
lage,* 18 Neb. 176, 24 N. W. 728; *Armbruster* v. *Wilson,* 43
Hun (N. Y.), 261.)

"The requisitions of the statute are necessary muniments of
title, against the original owner, and it is incumbent upon
one who relies upon such a title to see that the statute has
been complied with, and to preserve the evidence to show such
compliance.  The decisions are numerous which hold that 'es-
tray' proceedings are *stricti juris,* and the burden is on him
who claims under title thus acquired to show affirmatively that
the statute has been strictly complied with.  (*Dillard* v. *Webb,*
55 Ala. 468; *Corey* v. *Dennis,* 93 Ala. 440, 9 South. 302;
*Stewart* v. *Hunter* [16 Or. 62], 16 Pac. 876, 8 Am. St. Rep.
267, 272, note; *City of Ft. Smith* v. *Dodson,* 51 Ark. 447, 11
S. W. 687 [4 L. R. A. 252], 14 Am. St. Rep. 62, and note)."
(*McCrossin* v. *Davis,* 100 Ala. 61, 13 South. 607.)

Under the statute governing estrays, the only true test gov-
[4]  erning its application is that the animal should be wan-
dering, and that the owner be unknown to the person who
takes it up as an estray. (*Kinney* v. *Roe,* 70 Iowa, 509, 30
N. W. 776; *Hardy* v. *Nye,* 63 N. H. 612, 3 Atl. 631; *Stewart*
v. *Hunter,* 16 Or. 62, 8 Am. St. Rep. 267, 16 Pac. 876.)  Cat-
tle driven along a road in charge of a herder, and which, in
passing, casually eat of the grass growing on the roadside, are
not "estray" or "running at large" under the statute, and
the fact that the herder accidentally falls asleep while attend-
ing to the cattle does not cause them to be "running at large"
or "estray" within the meaning of the Act. (*Thompson* v.

*Corpstein,* 52 Cal. 653.) So when cattle are in the public highway, in charge of a person directing or controlling their movements, they are not "running at large." (*Bertwhistle* v. *Goodrich,* 53 Mich. 457, 19 N. W. 143.)

From the most cursory examination of the statutes, it is manifest that the defendants did not follow the requirements of either the Herd Law or the Estray Law. They appear to have operated entirely independent of statutory requirements, by virtue alone of a law unto themselves. In consequence, we are at a loss to account for the court's findings and judgment. It is clear that, since the defendants wholly failed to comply with the requirements of either the Herd Law or the Estray Law (secs. 3333 to 3345, Rev. Codes 1921), they must be held to account for a conversion of the plaintiff's property.

For the reasons stated the judgment is reversed and the cause is remanded to the district court of Stillwater county for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MYERS and MATTHEWS concur.

MR. JUSTICE STARK, being disqualified, takes no part in the foregoing decision.