No. 98-441

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 334

303 Mont. 96

15 P. 3d 1205

MARY LARSON-MURPHY,
Plaintiff, Appellant, and Cross-Respondent,

v.

EDWIN and VIOLET STEINER, DARIN STEINER,and AUGUST ZANCANELLA,Defendants,
Respondents and Cross-Appellants.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Tom L. Lewis, J. David Slovak, Lewis, Huppert & Slovak, Great Falls, Montana

For Respondents:

Donald L. Harris, Colette Baumgardner-Davies, Crowley, Haughey, Hanson, Toole & Dietrich, Billings,
Montana (Steiners); James Walen, Stacey & Walen, Billings, Montana (Zancanella)

Heard: July 13, 1999

Submitted: September 28, 1999

Decided: December 14, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Mary Larson-Murphy (Larson-Murphy) appeals from a directed verdict judgment entered on May 14, 1998, in favor of Defendants Edwin, Violet, and Darin Steiner (Steiners), by the Thirteenth Judicial District Court, Yellowstone County. Larson-Murphy also appeals the District Court's January 6, 1997 order granting summary judgment in favor of Defendant August Zancanella (Zancanella).

¶2 The Steiners cross-appeal three of the District Court's orders, which denied their motions for summary judgment, respectively on October 29, 1996, and November 19, 1997, and their motion to reconsider, on January 6, 1997.

¶3 We affirm in part, reverse in part, and remand for further proceedings.

## ISSUES PRESENTED

¶4 The parties have raised numerous issues on appeal and cross-appeal. We consolidate them for discussion as follows:

*1. Did the District Court err in granting summary judgment to Zancanella?*

*2. Did the District Court err in denying summary judgment to the Steiners?*

*3. Did the District Court properly grant the Steiners' motion for a directed verdict?*

## FACTUAL BACKGROUND

¶5 This case involves an accident between a vehicle driven by Larson-Murphy and a black Angus bull owned by the Steiners. Shortly after 11:30 p.m. on May 8, 1993, Larson-Murphy was driving home in a southbound direction on Hoskin Road near Billings, Montana. She crested a slight rise in the highway created by an irrigation ditch culvert,

and struck the bull. Upon impact, the bull rolled onto the hood and crashed through the windshield of the vehicle.

¶6 According to trial testimony, the impact with the bull broke virtually every bone in Larson-Murphy's mid-face and jaw, and dislodged her teeth. Bull hair was actually removed from several of the bone fractures. Multiple reconstructive surgeries were required. As a result of the accident, Larson-Murphy's vision was permanently damaged.

¶7 It is undisputed that Larson-Murphy was not at fault. She was driving lawfully at the time of the accident. The investigating highway patrolman calculated Larson-Murphy's speed at approximately 34 miles-per-hour, and stated that speed was not a factor in the collision. He further stated that no motorist could have avoided hitting the bull, which was standing in the middle of the highway, because of the darkness of the night and the slight rise in the highway.

¶8 Hoskin Road is a two-lane, paved county highway that it is neither a state highway nor a part of the federal-aid primary highway system. The undisputed facts indicate that the road sees fairly significant motor vehicle traffic. Also, the accident occurred on a stretch of Hoskin Road lying within a "herd district," as provided pursuant to §§ 81-4-301 through 310, MCA.

¶9 It is apparent from the record that the bull escaped from not one, but two enclosures. It is undisputed that the bull had been placed by the Steiners in a triangular, fenced pasture located roughly 100 yards from Hoskin Road with five heifers for breeding purposes. The Steiners had leased both the triangular pasture and an adjacent pasture from Zancanella. As part of the lease agreement, the Steiners agreed to maintain all of the pasture fences. The Steiners were required to maintain liability insurance under the lease, and it was the understanding of the parties that the Steiners would be responsible for any damage that might be caused by their livestock escaping.

¶10 It is unclear, and therefore in dispute, as to how the bull escaped from the triangular pasture to the other leased pasture which borders Hoskin Road, where it was observed by a neighbor prior to the accident. After the accident, both Darin Steiner and the investigating highway patrolman inspected the fence which enclosed the pasture on the west side of Hoskin Road and found that the fence was intact and that no gates had been left open. There were no signs of broken barbed wire, damaged fence posts, or downed gates.

¶11 During the course of litigation, however, Larson-Murphy contended that the bull may have escaped through a gate in the perimeter fence enclosing the pasture on the west side of Hoskin Road. Larson-Murphy presented evidence that the gate was loose with wide gaps between the wires, and that an irrigation ditch which passed directly beneath the gate created a gap under which an animal could escape from the pasture. The gate in question is located within 100 feet of the accident site.

¶12 Darin Steiner conceded that the perimeter fence had apparently failed to restrain the bull on the night in question, and admitted that the bull was capable of jumping over the fence and thereby obtaining access to the highway. Edwin Steiner also testified that he was aware that it would be dangerous to allow livestock to roam freely in the area, unrestrained by fences. Nevertheless, the Steiners have consistently maintained that the fences and gates on the leased property were well-maintained at the time of the accident.

## PROCEDURAL BACKGROUND

¶13 Larson-Murphy filed her complaint with the District Court on April 26, 1995, and generally alleged that the Steiners negligently allowed the black Angus bull to leave their leased premises and occupy the highway right-of-way. Her complaint was later amended and filed on January 5, 1996, to include Zancanella, the owner of the property leased to the Steiners. Likewise, Larson-Murphy alleged that Zancanella, as owner and lessor of the land adjacent to Hoskin Road, was negligent in operating and controlling the premises in a reasonably safe manner.

¶14 The District Court, in its May 8, 1998 Memorandum, concluded that the Hoskin Road area was not open range pursuant to § 60-7-102(4), MCA, and accordingly "the open range doctrine does not apply in this case." The Steiners claimed that although the leased premises from which the bull escaped were located within a herd district, Hoskin Road, as a matter of law, was open range. The Steiners legal theory maintained that if the highway was within open range, they had no duty to anyone, including motorists, to prevent the bull from wandering onto and occupying the highway, and therefore could not be liable for any damages suffered by Larson-Murphy. Larson-Murphy alleged that the open range doctrine does not apply in herd districts, including the traversing roads, and that the Steiners had a legal duty to maintain a "legal fence" pursuant to state law.

¶15 The court's legal conclusion that the accident did not occur in "open range" followed a series of motions for summary judgment and a motion for reconsideration brought by the

respective Defendants. On October 29, 1996, the District Court denied the Defendants' motion for summary judgment, concluding that the Defendants had failed to establish that they lacked a duty to maintain legal fences and keep livestock off Hoskin Road. The court concluded issues of material fact remained in dispute.

¶16 Then, on January 6, 1997, the court granted Defendant Zancanella's motion for summary judgment, pursuant to a "motion to dismiss" and dismissed him from this action. The court concluded he did not own the bull involved with the accident, and was not responsible for maintaining any of the fences in question. At the same time, the court nevertheless denied the Steiners' motion to reconsider, again concluding that the issue of whether the accident occurred in an open range area remained a material issue of fact.

¶17 The Steiners' again moved for summary judgment on October 7, 1997, arguing that although the accident occurred within a herd district, this Court's decision in *Williams v. Selstad* (1988), 235 Mont. 137, 766 P.2d 247, provided a legal basis for determining that the accident nevertheless occurred in open range. The District Court, on November 19, 1997, determined that it could not, as a matter of law:

> [R]ule that this area is open range, and that the open range no-duty law applies to the Defendants in this case. Material issues of fact still exist regarding the status of this area, and the road where the accident occurred. These facts are for a jury to decide.

¶18 Nevertheless, the court entered a directed verdict in favor of the Steiners on May 13, 1998, after the trial had begun on May 11, 1998. This judgment was entered without an accompanying memorandum providing a legal basis for the court's decision.

¶19 Both Larson-Murphy and the Steiners appealed. Due to the controversial nature of the "open range doctrine" law at issue, this Court also accepted numerous *amicus curiae* briefs.

## STANDARD OF REVIEW

¶20 By way of appeal and cross-appeal, both parties challenge the District Court's granting and denying motions for summary judgment during the proceedings below. Our review of the District Court's summary judgment rulings is governed by Rule 56, M.R.Civ.P. Summary judgment is proper only where the record reveals a complete absence of genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

Rule 56(c), M.R.Civ.P.; *Clark v. Eagle Sys., Inc.* (1996), 279 Mont. 279, 283, 927 P.2d 995, 997. We scrutinize a trial court's ruling on a summary judgment motion *de novo*, utilizing the same evaluation as the district court based upon Rule 56, M.R.Civ.P. *Dorwart v. Caraway*, 1998 MT 191, ¶ 15, 290 Mont. 196, ¶ 15, 966 P.2d 1121, ¶ 15.

¶21 Finally, this Court has held that issues of negligence are generally not susceptible to summary judgment and are properly left for a jury determination at trial. *Kolar v. Bergo* (1996), 280 Mont. 262, 266, 929 P.2d 867, 869.

¶22 Our review of a directed verdict, which is granted pursuant to Rule 50(a), M.R.Civ.P., is governed by well-established principles. We consider only the evidence introduced by the party against whom the directed verdict is granted. *Riley v. American Honda Motor Co., Inc.* (1993), 259 Mont. 128, 131, 856 P.2d 196, 198. If that evidence, when viewed in a light most favorable to the party, tends to establish the case made by the party's pleading, we will reverse the directed verdict. *Riley*, 259 Mont. at 131, 856 P.2d at 198 (citing *Boehm v. Alanon* (1986), 222 Mont. 373, 379, 722 P.2d 1160, 1163). The test commonly used to determine if the evidence is legally sufficient to withdraw cases and issues from the jury is whether reasonable persons could not draw different conclusions from the evidence. *Riley*, 259 Mont. at 131, 856 P.2d at 198.

¶23 We will affirm a district court's grant of a directed verdict, however, if the court's conclusion is correct; the reasons given by the court for granting the directed verdict are immaterial to our review. *Riley*, 259 Mont. at 131, 856 P.2d at 198 (citing *Laurie v. M. & L. Realty Corp.* (1972), 159 Mont. 404, 408, 498 P.2d 1192, 1194).

¶24 Here, the District Court gave no reason for entering the directed verdict in favor of the Defendants. Nevertheless, we will review the evidence in the light most favorable to Larson-Murphy and determine whether it is sufficient for reasonable persons to draw different conclusions.

## DISCUSSION

### *I. Introduction*

¶25 This case involves a general misconception of the import of Montana's "open range doctrine" in matters involving the legal relationship between the owners of livestock and users of motor vehicles on Montana highways. In sum, the law governing the action

below, as expressed by the District Court, can be summarized as follows: (1) if the accident occurred in an "open range" area, then the directed verdict was proper because the Steiners owed no legal duty to anyone to prevent their black bull from standing in the middle of Hoskin Road at night regardless of any foreseeable risk such an obstruction posed to passing motorists; or (2) if the accident *did not* occur within an open range area, then the action may proceed, because under the circumstances the Steiners conceivably owed a legal duty to motorists to prevent their bull from occupying and obstructing Hoskin Road.

¶26 We conclude that as an expression of the prevailing law in Montana, the foregoing is incorrect. Namely, what has been termed the "no duty rule" under the open range doctrine does not apply to the legal relationship between livestock owners and motorists traveling on this state's highways.

¶27 Nevertheless, we also conclude that the "law of the open range remains the law of this state." *See State ex rel. Martin v. Finley* (1987), 227 Mont. 242, 245, 738 P.2d 497, 499. Further, we also conclude that the term "open range" includes all highways outside of private enclosures and used by the public, as provided under § 81-4-203, MCA, unless so modified by this state's Legislature. *See State ex rel. Martin*, 227 Mont. at 244, 738 P.2d at 498 (stating that under § 81-4-203, MCA, "all highways in the state are included under the open range concept"); § 81-4-306, MCA (proscribing livestock owners from willfully permitting livestock from running at large within any herd district); § 60-7-201 and 202, MCA (prohibiting livestock from grazing, remaining upon, or occupying certain state highways).

¶28 As a starting point in addressing the foregoing apparent contradictions, the terms "open range" and "open range doctrine" as they appear in Montana statutes and interpretive case law have little or nothing at all to do with the legal relationship between livestock owners and motorists under a theory of negligence. Simply stated: the assumption that a person's livestock may lawfully occupy--or "wander" upon--any public highway in an "open range" area of this state does not absolutely determine whether or not the owner owes a subsequent legal duty to motorists. Most motor vehicles may also lawfully occupy and roam public highways. In the absence of a governing statute addressing this legal relationship, however, neither enjoy blanket immunity from exercising ordinary care. *See*, *e.g.*, § 27-1-701, MCA (providing that "[e]xcept as otherwise provided by law, everyone is responsible not only for the results of his willful acts but also for an injury occasioned to another by his want of ordinary care or skill in the

management of his property or person except so far as the latter has willfully or by want of ordinary care brought the injury upon himself").

¶29 In contrast, under Montana's current open range doctrine, as expressed under our "Containment of Livestock" statutes, livestock owners owe no legal duty to *other landowners* to prevent their livestock, which may otherwise lawfully occupy the open range, from *accidentally* trespassing onto the other landowner's unfenced property--and no more. While this pronouncement may seem in direct conflict with clear enunciations of law issued by this Court (*see*, *e.g.*, *Bartsch v. Irvine Co.* (1967), 149 Mont. 405, 427 P.2d 302), it is equally apparent that the underlying legal principles expressed by Montana's open range doctrine statutes have been misconstrued over time, and misapplied in the context of the specific legal relationship at issue here.

¶30 As the parties here acknowledge, Larson-Murphy's negligence action may be maintained only if there was a legal duty or obligation that required the Defendants to conform to a particular standard of conduct in order to protect motorists, as foreseeable plaintiffs, against unreasonable risks of harm. *See generally Lopez v. Great Falls Pre-Release Services, Inc.*, 1999 MT 199, ¶¶ 27-28, 295 Mont. 416, ¶¶ 27-28, 986 P.2d 1081, ¶¶ 27-28. The existence of a duty or obligation is a question of law to be determined by the court. *See Yager v. Deane* (1993), 258 Mont. 453, 456, 853 P.2d 1214, 1216. Finally, no immutable rule can be established to determine the extent of a legal duty or obligation for every circumstance of the future; rather, duty or obligation must necessarily be adjudicated upon a case-to-case basis. *See Busta v. Columbus Hosp. Corp.* (1996), 276 Mont. 342, 362, 916 P.2d 122, 134 (quoting *Mang v. Eliasson* (1969), 153 Mont. 431, 437-39, 458 P.2d 777, 781-82).

¶31 In turn, the question of duty is a "problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other." W. Page Keeton et. al., *Prosser & Keeton on the Law of Torts*, § 53 (5th ed. 1984) (hereinafter *Prosser & Keeton*). *See also* Restatement (Second) of Torts § 291, comment f (stating that "[s]ome relationship between the parties or some precedent action is necessary to create such a duty, and duties of positive action are not imposed except under circumstances in which normally the benefit to the other outweighs the burden to the actor").[(1)]

¶32 Accordingly, a court's determination of legal duty in this instance must be tailored to the relationship of the particular parties: an owner of livestock whose bull escaped confinement and then wandered onto and obstructed a county highway, and a motorist

lawfully driving a vehicle on that same road. And therein lies the problem inherent within our current jurisprudence governing Montana's "open range doctrine" as the discussion below will address. Namely, no statute explicitly creates or absolves any legal duties particular to the parties here under the circumstances and yet, regrettably, this Court has set forth precedent that would seem to indicate the Montana Legislature, in codifying various tenets and modifications of the open range doctrine, have established such a comprehensive body of law. We conclude it has not.

¶33 Thus, we proceed to our discussion of what is, and what is not, the law of this case before addressing the issues presented on appeal.

## II. Montana's Open Range Doctrine

### A. The common law rule

¶34 In contrast to the "open range doctrine" in the American west, the English common law held the owner of livestock strictly liable for damages caused to another landowner's property as a result of a trespass. *See Monroe v. Cannon* (1900), 24 Mont. 316, 61 P. 863 (stating common law rule that an owner of cattle must answer in damages if they stray upon the land of another and "tread down his neighbor's herbage, and spoil his corn or his trees"); *Prosser & Keeton*, § 76 (stating that "[t]hose who keep such animals for their own purposes are required to protect the community, at their peril, against the risk involved"); Roy H. Andes, *A Triumph of Myth Over Principle: The Saga of the Montana Open-Range*, 56 Mont.L.Rev. 485, 486 (1995) (explaining that the common law rule applies in most American jurisdictions, particularly in the eastern United States) (hereinafter *Andes*).

¶35 Pursuant to this strict liability theory, proving any degree of fault was unnecessary. Thus, the owner was liable regardless of whether the trespass resulted from pure accident or an intentional act. The principle that a livestock owner must "fence-in" or in some manner restrain his livestock to prevent such a trespass developed from this general common law rule. *See generally Thompson v. Mattuschek* (1959), 134 Mont. 500, 506, 333 P.2d 1022, 1025; *Andes*, 56 Mont.L.Rev. at 486.

### B. Modification of the common law in the American west.

¶36 As a modification of the foregoing common law rule, Montana's "open range doctrine" that took hold during this state's early territorial days in the 1800s exclusively

applied to the legal relationship between landowners by redefining an aggrieved party's remedy for trespass.

¶37 Under this doctrine, in order to hold a livestock owner strictly liable for trespass damages, a landowner carried the burden of establishing, as a condition precedent, that he had constructed a "lawful fence" surrounding his entire property. *See Schreiner v. Deep Creek Stock Ass'n* (1923), 68 Mont. 104, 110, 217 P. 663, 665. Otherwise, livestock could "roam" onto private property and graze and water at will, and the aggrieved landowner could not recover damages for such a trespass. *See Smith v. Williams* (1874), 2 Mont. 195, 197, 202. From a pragmatic standpoint, the open range doctrine did nothing more than allocate the cost of constructing and maintaining a fence to landowners who wished to exclude livestock from their property.

¶38 As explained by scholars and various courts over the years, the underlying reason for modifying the common law remedy as well as reassigning the cost burden--and providing livestock owners with what amounted to a trespass liability shield--was that the range cattle industry of the 19th century was based on the availability of unoccupied public domain, which as a matter of state and federal policy remained open for grazing purposes. *See* Valerie Weeks Scott, *The Range Cattle Industry: Its Effect on Western Land Law*, 28 Mont.L.Rev. 155, 156, 178-81 (1967) (stating that a typical rancher in the late 1800s required between 2,000 and 50,000 acres of land upon which to graze his cattle) (hereinafter *Scott*). Scott's article quotes an early Colorado decision indicating the underlying policy of shifting the cost of fencing to landowners--namely farmers--who wished to exclude another person's livestock from their property:

> The commons are now owned principally by the State and by the general government, and if the grasses which grow thereon are not depastured, they will waste and decay. And while it is impracticable to purchase and fence sufficiently pasture lands for the stock, the tillage and meadow lands can be fenced, and, in point of fact, are now inclosed in nearly all parts of the state.

*Scott, 28 Mont.L.Rev. at 179 (quoting Morris v. Fraker, 5 Colo. 425, 428-29 (1880)). See also Lazarus v. Phelps (1894), 152 U.S. 81, 85, 14 S.Ct. 477, 478, 38 L.Ed. 363 (stating that "it was not thought proper, as the land was gradually taken up by individual proprietors, to change the custom of the country in that particular, and oblige cattle owners to incur the heavy expense of fencing their land, or be held as trespassers by reason of their cattle accidentally straying upon the land of others").*

¶39 Thus, in the days of this Court's 1874 *Smith* decision, an owner's cattle were free to

roam the open range immune from liability in the event livestock wandered onto a neighbor's unfenced property and caused damages. *See Schreiner*, 68 Mont. at 109, 217 P. at 665 (stating that "[t]his state has long been a public range state wherein livestock of private ownership have been and now are permitted by license of the government to graze without hindrance or restriction on the open, unoccupied, public domain"). It was from this particular relationship between landowners that the open range "no-duty" rule arose. *See*, *e.g.*, *Beinhorn v. Griswold* (1902), 27 Mont. 79, 90, 69 P. 557, 558 (explaining that the "cattle-owning plaintiff did not owe to the land-owning defendant the duty to fence his cattle in" and likewise the latter "did not owe to the former the duty to fence them out . . . . neither of them was under obligation to the other in that regard").

¶40 While born from custom, these trespass rules were legislated into law early on and remain codified to this day in Montana. As this Court stated in its pivotal decision, *Bartsch v. Irvine Co.*, "[w]hen Montana became a state, the policy of the open range continued, and the Legislature enacted various statutes *which dealt with trespass by livestock and the necessity of lawful fences to support any action for trespass*." *Bartsch*, 149 Mont. at 408, 427 P.2d at 304 (emphasis added).

¶41 The Territorial statutes at issue in *Smith*, as the parties and *amici* thoroughly address, are in fact substantially the same as several of the statutes at issue here. *See* § 81-4-101, MCA (defining legal fence),[2] and § 81-4-215, MCA (imposing on "owners of stock" liability for all trespass damages resulting from livestock breaking into "any enclosure" if the "fence of the enclosure is legal" pursuant to § 81-4-101, MCA).

¶42 Accordingly, the "legal fence" statutes did not create any affirmative duty to fence; rather, the open range "legal fence" statutes established only a standard of care for those landowners who chose to "fence-out" a livestock owner's animals. *See* § 81-4-103, MCA (establishing liability for damages "by reason of injury to stock" in the event a fence not described in § 81-4-101, MCA, is defective); § 81-4-104, MCA (requiring that barbed wire fences be kept in repair so as not to injure livestock).

¶43 Hence, the custom that a landowner must bear the financial burden of "fencing-out" his neighbor's cattle in order to recover damages--rather than requiring the livestock owner to bear the far more onerous cost of "fencing-in" his herd--became the statutory doctrine of Montana and other western states in determining liability for trespass. *See*, *e.g.*, *Smith*, 2 Mont. at 197, 202 (holding that the "lawful fence" statute must be substantially complied with "before a right of action accrues," and stating that the action was "in the nature of

trespass . . . to recover damages," after the defendant's cattle broke and entered the farm or inclosure of the plaintiff, and destroyed his grain crop) (Wade, C.J., writing for the Court). *See also Fant v. Lyman* (1889), 9 Mont. 61, 22 P. 120 (discussing trespassing sheep). *See generally Andes*, 56 Mont.L.Rev. at 487 (indicating that most other western states passed statutes substantively identical to Montana's); Coby Dolan, *Examining the Viability of Another Lord of Yesterday: Open Range Laws and Livestock Dominance in the Modern West*, 5 Animal L. 147, 151-52 (1999) (discussing the custom of open range in the west and its early recognition by various courts).

¶44 This statutory modification of the English common law strict liability rule was acknowledged and deemed proper by this Court. *See Beinhorn*, 27 Mont. at 89, 69 P. at 558 (stating that "[b]y custom as well as by statute the common law of England has been so modified in Montana . . . [t]his is undoubtedly a legitimate exercise of the police power"). *See also* § 1-1-108, MCA (originally enacted in 1895, and providing that in this state there is no common law in any case where the law is declared by statute); § 1-2-103, MCA (originally enacted in 1895, and providing that statutes in derogation of the common law "establish the law of this state respecting the *subjects to which they relate*, and their provisions and all proceedings under them are to be liberally construed with a view to effect their objects and to promote justice") (emphasis added).

¶45 Thus, the statutory "open range doctrine" proceeded into the 20th century.

### III. Exceptions to the Open Range Doctrine

#### A. Exclusion of intentional conduct

¶46 By the turn of the century the west's open range doctrine was narrowed, excluding all but accidental trespasses from the statutory "fence-out" rule. In Montana, the modification followed a U.S. Supreme Court decision, *Lazarus v. Phelps*, which arose in Texas. The *Lazarus* decision essentially waived the "fence-out" condition precedent in cases where the trespass was intentional, reasoning that the open range doctrine applied narrowly only to those trespasses that were accidental--where livestock merely followed the inherent instinct to seek food and water. *See Lazarus*, 152 U.S. at 85, 14 S.Ct. at 478. *See also Fant*, 9 Mont. at 61-62, 22 P. at 120-21 (indicating that willful or malicious herding of sheep onto plaintiff's land by owner would exempt plaintiff from lawful fence requirement).

¶47 This narrowing of the doctrine was followed by this Court in 1900, in *Monroe v. Cannon* (1900), 24 Mont. 316, 61 P. 863. In that case, it was undisputed that the plaintiff's land was not fenced. Nevertheless, the Court affirmed the plaintiff's right to recovery for damages where the defendant had willfully or maliciously herded his sheep onto the plaintiff's land. *See Monroe*, 24 Mont. at 324-26, 61 P. at 865-66 (following *Lazarus v. Phelps*, and distinguishing *Smith v. Williams* and *Fant v. Lyman*).

¶48 Thus, at the start of the 20th century in Montana, livestock trespasses resulting from willful, malicious, or even negligent conduct by the livestock owner followed the English common law rule and waived the lawful fence requirement, leaving only purely accidental livestock trespasses under the open range doctrine, which required a lawful fence in order to recover damages. *See*, *e.g.*, *Bartsch*, 149 Mont. at 409, 427 P.2d at 305 (providing that "willful or intentional herding or driving of livestock onto another's unfenced land or placing them so near that trespass is bound to occur" is an exception to the open range doctrine) (quoting *Montgomery v. Gehring* (1965), 145 Mont. 278, 283, 400 P.2d 403, 406); *Andes*, 56 Mont.L.Rev. at 488-93 (discussing narrow application of open range doctrine under *Lazarus* to include only accidental trespass of livestock); § 1-2-103, MCA (providing that statutes in derogation of the common law "establish the law of this state respecting the subjects to which they relate" and should be liberally construed to "effect their objects") (emphasis added).

## B. Exclusion of certain animals

¶49 Montana's Legislature has, over time, amended the open range "Containment of Livestock" statutes to prohibit owners from allowing certain kinds of animals to run at large. *See* § 81-4-201, MCA (prohibiting swine, sheep, llamas, alpacas, bison, ostriches, rheas, emus, and goats from "running at large"); § 81-4-204, MCA (prohibiting male equine from running at large on the open range); § 81-4-210, MCA (prohibiting any kind of bull that is not purebred, and any bull between December 1 and June 1 of each and every year from running at large upon "any such public highways, open range, or national forest reserve"); § 81-4-211, MCA (prohibiting female breeding cattle unaccompanied by a purebred bull from running at large upon "the public ranges or national forest reserves"). *See also Jorgenson v. Story* (1927), 78 Mont. 477, 493, 254 P. 427, 432 (stating that "when cattle are in the public highway, in charge of a person directing or controlling their movements, they are not 'running at large'").

¶50 The foregoing statutes are accompanied by penalties, including monetary fines,

liability for damages "to any party injured by the violation," castration of the offending animal, and even killing of the offending animal. *See* §§ 81-4-202, 207, 208, 209 and 212, MCA. Thus, any trespass resulting from the intentional act of permitting such animals to run at large waives the "fence-out" condition precedent of the open range doctrine. *See* § 81-4-217, MCA (allowing retention of "wrongfully" trespassing animal as well as those breaking through legal fences); § 81-4-215, MCA (providing that "[t]his section may not be construed to require a legal fence in order to maintain an action for injury done by animals running at large contrary to law).

¶51 Further, the monetary penalty under § 81-4-202, MCA, as well as the "damages to any party injured" language expanded the scope of the open range doctrine to provide a benefit for the general public, not just a landowner who suffers damages as a result of a trespass. Nevertheless, the conduct proscribed under §§ 81-4-201, 204, 210 and 211, MCA, is explicitly intentional. Thus, an accidental escape of one of the animals identified under these statutes from an owner's premises is not a *per se* violation. As made clear by this Court in *Monroe*, and the U.S. Supreme Court in *Lazarus*, the open range doctrine, as a modification of the common law, never included intentional conduct. *See Monroe*, 24 Mont. at 324-26, 61 P. at 865-66.

¶52 Finally, liberally construing Part 2 of our "Containment of Livestock" statutes as a whole, it is clear that "open range" includes "all highways" or "public highways" that pass through open range areas. *See* § 81-4-203, MCA (providing that the term "open range" includes "all lands in the state of Montana not enclosed by a fence of not less than two wires in good repair" as well as "all highways outside of private enclosures and used by the public");[(3)] § 81-4-210, MCA (providing that non-purebred bulls, and all bulls between December 1 and June 1 shall not be turned upon or allowed to run at large on "public highways, open range, or national forest reserve" within the state).

¶53 Even so, we conclude that these statutes offer no clear enunciation of any explicit legal duty owed by livestock owners to motorists beyond the inferential duty to not intentionally permit certain animals to occupy highways, which does not include negligent conduct. Therefore, the "running at large" statutes, under a negligence theory, at the most establish a different standard of care for owners of certain livestock from that required in open range areas: in open range, certain animals may be lawfully permitted to occupy highways, and other animals may not. Again, the only clear legal duty addressed by the foregoing is that between livestock owners and landowners.

## C. Exclusion of statutory herd districts

¶54 Under Part 3 of Montana's Containment of Livestock statutes, the Montana Legislature has permitted landowners to exempt a particular area of land from the open range. *See* § 81-4-301, MCA (stating requirements for herd district creation); § 81-4-322, MCA (stating requirements for horse herd districts). This exemption is not absolute; such a district may be in effect for only certain months of the year. *See* § 81-4-305, MCA.

¶55 Critical to our discussion is the fact that the term "fence" (legal or otherwise) does not appear once under this Part in any form, nor did the Legislature include any reference to highways and motorists. *See* §§ 81-4-301 through 328, MCA. Further, aside from the horse herd district statutes, the more general herd district laws prohibit only willful acts. *See* § 81-4-306, MCA (providing penalty to owner who "willfully permits the animals to run at large").[4] *See also Jenkins v. Valley Garden Ranch, Inc.* (1968), 151 Mont. 463, 466-67, 443 P.2d 753, 755 (equating "willfully" with "purposely or knowingly" and concluding that escaped cattle did not result from willful act). Thus, similar to § 81-4-201 through 220, MCA, the herd district statutes do not explicitly contemplate that a livestock owner whose animal accidentally escapes from the owner's premises commits a *per se* violation of the statute, or that livestock may lawfully occupy roads within herd districts under the care of herders.

¶56 In light of these omissions, and of particular relevance to the action here, this Court's decision in *Williams v. Selstad* (1988), 235 Mont. 137, 766 P.2d 247, addressed whether herd districts under §§ 81-4-301 through 328, MCA, provided an exception to Montana's open range doctrine. Specifically, the Court addressed whether the statutes imposed a duty on livestock owners to keep livestock from "wandering onto the roadway within the herd district." *Williams*, 235 Mont. at 139, 766 P.2d at 248. Ultimately, we held that the "Legislature did not intend to change the open range no-duty rules through enactment of the herd district statutes." *Williams*, 235 Mont. at 141, 766 P.2d at 249.

¶57 This holding, however, was premised on the assumption that "the open range doctrine relieves owners or possessors of livestock of a duty to keep their livestock from wandering onto the roadway," which in turn inferentially applied the "no duty" standard to livestock owners whose animals are involved with accidents with motorists. *Williams*, 235 Mont. at 138, 766 P.2d at 247-48.

¶58 With the enactment of herd district statutes, pursuant to §§ 81-4-301 through 328,

MCA, the open range doctrine rule that livestock may follow their instincts, and freely wander in search of food and water, came to an end once such a district was created. If owners of livestock are statutorily proscribed from permitting their animals to "run at large," then the notion that the owner of livestock "has no duty to prevent the livestock from wandering" no longer exists. *Compare* § 81-4-306, MCA (prohibiting any livestock owner from "willfully" permitting animals to run at large within herd district) *with Bartsch*, 149 Mont. at 409, 427 P.2d at 305 (stating that an owner of livestock has no duty to prevent livestock from wandering in open range country). In turn, if the open range includes "all highways outside private enclosures used by the public," as we have already concluded, then highways passing through herd districts are no longer part of the open range, as a matter of law, during those periods when the herd district is in effect.

¶59 Again, there is no express broadening of the underlying legal relationship that the open range doctrine addresses: livestock owners and landowners. Rather, as a matter of law, herd districts are no longer "open range," and therefore the open range "fence-out" rule is no longer required to maintain an action for trespass, which ostensibly returns such districts to the common law trespass rule during those periods when they are in effect. *See* § 81-4-307, MCA (entitled "Trespassing animals in herd districts" and permitting the owner of premises "wrongfully" entered by animals referred to in § 81-4-306, MCA, to recover damages and costs, with no mention of legal fence requirement).

¶60 Thus, the Court in *Williams* correctly stated that the herd district statutes "were intended only to protect landowners and owners of livestock." *Williams*, 235 Mont. at 140, 766 P.2d at 248. In turn, the Court also was correct in its conclusion that it was not clear whether "Montana's Legislature intended to create a duty owed to motorists through enactment of the herd district statutes," *Williams*, 235 Mont. at 140, 766 P.2d at 248, and thus such a duty may not be judicially "inserted" by this Court. *See* § 1-2-101, MCA. The Court incorrectly assumed, however, that the open range doctrine's "no duty" rule that applied exclusively to livestock owners and landowners inferentially applied to the legal relationship between livestock owners and motorists--an assumption that the statutes simply fail to address.

¶61 Therefore, we overrule *Williams v. Selstad* to the extent that it holds that the open range doctrine "no duty" rule may be applied to the legal relationship between livestock owners within a herd district and motorists traveling on herd district highways. We further hold, however, that the herd district statutes, similar to the "running at large" statutes discussed above, do not establish an explicit legal duty owed by livestock owners to

motorists beyond the inferential duty to not intentionally permit certain animals to run at large within the districts--which, again, does not include negligent conduct. Rather, we conclude that the herd district statutes--like the running at large statutes--establish a different standard of care for owners of livestock from that found in open range areas: in open range, certain animals may be lawfully permitted to occupy highways, in herd districts none may be lawfully permitted to "run at large" on highways.

### D. Exclusion of statutorily designated state highways.

¶62 Similar to the "running at large" and herd district statutes, our Legislature in 1951 removed certain state highways from the open range--again, without invoking any explicit statutory duties arising from the legal relationship of livestock owners and motorists. The Legislature merely made it unlawful for livestock owners to use certain U.S. and state highways as a "place for the pasturage or running of livestock." *See* Ch. 95, L. 1951. Codified under §§ 32-1018-1020, RCM, the statutes were originally inserted under the "obstructions and encroachments" chapter of the Highways, Bridges and Ferries statutes.

¶63 Unlike the "running at large" and herd district statutes, however, traffic safety on such highways can reasonably be presumed as one of the purposes of what would eventually become §§ 60-7-201 through 205, MCA.[5] Nevertheless, there was never an explicit legal duty, or a standard of liability, ascribed to livestock owners that was owed to motorists. *See and compare*, *e.g.*, § 49-4-216, MCA (describing duty and civil liability of pedestrian or driver approaching blind person); § 61-5-108, MCA (describing liability of minors imputed to parents under motor vehicles statute); § 61-6-201, MCA (describing liability of owner for negligence of employee driver); § 61-7-106, MCA (describing duty of a driver of any vehicle which collides with any vehicle which is unattended); § 61-7-107, MCA (describing duty of driver of any vehicle involved in an accident upon striking fixtures or other property upon a highway); § 61-8-384, MCA (describing liability of operator of a vehicle in a funeral procession).

¶64 Moreover, as originally codified, a violation occurred only if the livestock owner acted "wilfully," which first required that 24-hours' written notice be given to the owner by a peace officer informing the owner of the presence of his animals on the highway, or a finding that the owner "habitually permits such use of such highway by livestock." *See* Ch. 95, L. 1951. Otherwise, as originally conceived, there was no immediate legal duty owed by livestock owners to other highway users; rather, livestock could occupy a fenced highway traveled by motorist up until written notice was provided, or the livestock's

presence on a highway was deemed "habitual."

¶65 Today, § 60-7-201, MCA, is far less lenient. An owner of livestock now may not lawfully permit his livestock to graze, remain upon, or occupy a part of the right-of-way of:

> (1) a state highway running through cultivated areas or a part of the fenced right-of-way of a state highway if in either case the highway has been designated by agreement between the transportation commission and the secretary of transportation as a part of the national system of interstate and defense highways; or

> (2) a state highway designated by agreement between the transportation commission and the secretary of transportation as a part of the federal-aid primary system, except as provided in 60-7-202.

Under this statute, this Court has held that livestock owners in Montana may now be found "liable for negligent rather than wilful conduct which results in the presence of their cattle on the right-of-ways," but cannot be held strictly liable. *Ambrogini v. Todd* (1982), 197 Mont. 111, 120, 642 P.2d 1013, 1018 (construing the term "permit" subsequent to a legislative amendment that excised the term "wilful"). Nevertheless, the Legislature expressly provided that even if a livestock owner violates § 60-7-201, MCA, "there is no presumption or inference that the collision was due to negligence on the part of the owner or the person in possession of the livestock or the driver or owner of the vehicle." *See* § 60-7-203, MCA.

¶66 Further, under § 60-7-202, MCA, the prohibitions of § 60-7-201, MCA, do not apply to the following: (1) livestock on state highways under the charge of one or more herders; (2) the parts of fenced highways adjacent to open range where a highway device has not been installed to exclude range livestock; and (3) the parts of a state highway or a part of the federal-aid primary system which the department of transportation designates as being impracticable to exclude livestock.

¶67 In *Ambrogini*, this Court determined that because none of the foregoing exceptions applied to the facts, the livestock owner, Todd, had a "legal duty to exercise due care in preventing his livestock from wandering on Highway 10." *Ambrogini*, 197 Mont. at 121, 642 P.2d at 1019. After reviewing the facts of the livestock's escape from the defendant's premises, we further concluded that "[t]he reasonableness of Todd's conduct is for a jury

to decide" and therefore reversed the district court's summary judgment in his favor. *Ambrogini*, 197 Mont. at 121, 642 P.2d at 1019.

¶68 Thus, under the explicit terms of the foregoing statutes, an owner of livestock may not permit his livestock to freely wander on certain clearly defined state highways that, prior to enactment, may once have been part of the open range. Nevertheless, under certain circumstances, livestock may lawfully occupy such highways without violating the "grazing of livestock on highways" statutes. Accordingly, establishing a standard of reasonable care for livestock owners in their legal relationship with motorists on such highways is a fact-driven, circumstance-specific inquiry that is merely assisted by a proven violation of § 60-7-201, MCA.

### E. Summary of exclusions

¶69 Therefore, even with the various judicial and statutory modifications providing exceptions and exclusions, Montana's open range doctrine remains true to its original purpose from the 1874 *Smith* decision forward until 1967: to determine the rights and remedies arising from the relationship of livestock owners and landowners in actions involving the accidental trespass on private property of livestock lawfully occupying the open range. Although our Legislature statutorily altered the common law rule regarding trespass to fit the conditions of this state, and has subsequently from time to time modified these laws, it has not similarly addressed the common law rule regarding the duty, or lack of duty, owed by livestock owners to the users of public highways in Montana other than within the narrow scope of §§ 60-7-201 through 203, MCA, as addressed in *Ambrogini*.

¶70 We conclude, therefore, that any assertion of legal duties arising from the legal relationship between the owners of livestock and motorists is clearly beyond the scope of Montana's statutory "open range doctrine."

### IV. Bartsch and Indendi reconsidered

¶71 Until fairly recently, Montana's "open range doctrine," pursuant to all relevant statutes discussed thus far, applied exclusively to the legal relationship between landowners in actions involving the accidental trespass of livestock that lawfully run at large on the open range.

¶72 This course was altered, however, by two of this Court's decisions, *Bartsch v. Irvine*

*Co.* (1967), 149 Mont. 405, 427 P.2d 302, and *Indendi v. Workman* (1995), 272 Mont. 64, 899 P.2d 1085. *Bartsch* was the first decision that looked to the open range doctrine to determine whether or not a livestock owner owed a legal duty to a motorist driving on highways passing through open range, after a motorist brought an action for negligence following a fatal vehicle accident involving the defendant's horse. Likewise, *Indendi* considered whether the open range doctrine statutes governing a "legal fence" could be applied to livestock owners under a theory of negligence *per se*, in a case that also involved an accident between a vehicle and a horse.

¶73 We conclude that in light of the foregoing discussion, as well as the arguments set forth by the parties and *amici*, both decisions must be reconsidered.

### A. Bartsch v. Irvine Co.

¶74 The Court in *Bartsch* accurately recounted the history of open range trespass case law. *See Bartsch*, 149 Mont. at 407-409, 427 P.2d at 304-305. The *Bartsch* Court first cited the 1874 decision *Smith v. Williams*, and stated that the action was "brought for damages due to the trespass of cattle on plaintiff's land." Next, the Court cited the 1902 decision *Beinhorn v. Griswold*, and stated that in that case "the doctrine of open range was further discussed and explained in another trespass action." The Court then cited to the 1923 case, *Schreiner v. Deep Creek Stock Ass'n*, and referred to it as "another trespass action." Next, a 1959 case*, Thompson v. Mattuschek*, was cited for the proposition that "in range country [livestock] may wander." *Thompson* was a trespass action brought after the defendant's cattle damaged the plaintiff's barley crop. Finally, the Court cited *Montgomery v. Gehring*, a 1965 decision involving a boundary dispute between private landowners where the open range doctrine was raised. The excerpted quote from *Montgomery* included the open range doctrine rule that "[o]ne releasing his livestock onto lands where he has a right to do so is under no duty to restrain them from entering *another's unenclosed land*." *Bartsch*, 149 Mont. at 409, 427 P.2d at 305 (quoting *Montgomery v. Gehring* (1965), 145 Mont. 278, 283, 400 P.2d 403, 406) (emphasis added).

¶75 Omitting the operative terms "another's unenclosed land," the *Bartsch* Court then reasoned that because the owner of livestock owed no general duty to "prevent the livestock from wandering . . . . he cannot be said to be negligent if the livestock do wander--even if such wandering takes them onto a highway right of way which runs through open range." *Bartsch*, 149 Mont. at 409, 427 P.2d at 305. In reaching this conclusion, not once did the Court refer to any of the open range doctrine statutes. Further,

the Court did not cite to any other western-state jurisdiction's case law that had similarly extended the open range trespass doctrine to the legal relationship between livestock owners and motorists, under similar state laws. *See*, *e.g.*, *Kendall v. Curl* (Or. 1960), 353 P.2d 227, 231 (concluding that "[i]f cattle and horses have a right to be on the road [in open range areas], their owner is not negligent in allowing them on the road").

¶76 Subsequently, a series of decisions addressing and applying the open range doctrine to the legal relationship between livestock owners and motorists followed. *See Jenkins v. Valley Garden Ranch, Inc.* (1968), 151 mont. 463, 443 P.2d 753; *Sanders v. Mount Haggin Livestock Co.* (1972), 160 Mont. 73, 500 P.2d 397; *Ambrogini v. Todd* (1982), 197 Mont. 111, 642 P.2d 1013; *Siegfried v. Atchison* (1985), 219 Mont. 14, 709 P.2d 1006; *State ex rel. Martin v. Finley* (1987), 227 Mont. 242, 738 P.2d 497; *Williams v. Selstad* (1988), 235 Mont. 137, 766 P.2d 247; *Yager v. Deane* (1993), 258 Mont. 453, 853 P.2d 1214; *Indendi v. Workman* (1995), 272 Mont. 64, 899 P.2d 1085. *But see Williams*, 235 Mont. at 141, 766 P.2d at 249 (Sheehy, J., dissenting) (stating that for their purposes, "livestock containment laws have a valid application; for torts not related to their purposes, the livestock containment laws should be disregarded and the ordinary rules of negligence laws should apply").

¶77 *Amicus* Montana Stock Growers Association urges this Court to recognize the rule that this Court "may not substitute its judgment for that of Legislature." *See Bay v. Department of Admin.* (1984), 212 Mont. 258, 265, 688 P.2d 1, 4 (stating that it is "the province of courts to construe and apply the law as they find it and to maintain its integrity as it has been written by a coordinate branch of the state government").

¶78 We agree. Substituting its judgment for that of the Legislature is precisely what the Court in *Bartsch* accomplished by ignoring the fundamental purpose of Montana's open range doctrine by taking a statutory body of law that pertains to one particular legal relationship and applying it to another that the statutes involved simply do not address, and, consequently, inserting an expansive "no-duty" rule that, to this date, has been omitted from any legislation. *See* § 1-2-101, MCA (stating that "[i]n the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted").

¶79 We therefore overrule our decision in *Bartsch*--as well as subsequent decisions that followed *Bartsch*--to the extent that it holds that a livestock owner, pursuant to Montana's

"open range doctrine," owes absolutely no duty to motorists driving on public highways in open range areas. *See Yager*, 258 Mont. at 458, 853 P.2d at 1217; *Williams*, 235 Mont. at 139-40, 766 P.2d at 248; *State ex rel. Martin*, 227 Mont. at 245, 738 P.2d at 499; *Siegfried*, 219 Mont. at 16, 709 P.2d at 1007; *Ambrogini*, 197 Mont. at 119, 642 P.2d at 1018; *Jenkins*, 151 Mont. at 465, 443 P.2d at 755.

### B. *Indendi v. Workman*

¶80 In our 1995 decision, *Indendi v. Workman*, the injured driver, Indendi, brought a negligence claim against the owners of a horse with which she had collided. It was undisputed that the highway in question was part of the federal-aid primary system, and therefore subject to § 60-7-201, MCA, as well as our decision in *Ambrogini*.

¶81 The district court had determined that the owners of the horse, the Workmans, fell under the statutory exclusion, § 60-7-202(2), MCA, which provides that the general proscription of permitting livestock to occupy such highways does not apply to "the parts of fenced highways adjacent to open range where a highway device has not been installed to exclude range livestock." The court concluded that although the Workmans' horse had been confined within a fenced pasture, their ranch nevertheless was "open range," and therefore they owed no duty to prevent the horse from occupying the highway. *See Indendi*, 272 Mont. at 67, 899 P.2d at 1087.

¶82 We concluded that the factual statements in the court's memorandum and order were not substantiated by the record. *See Indendi*, 272 Mont. at 69, 899 P.2d at 1088. We concluded that the directed verdict entered in favor of the Workmans was therefore inappropriate because pursuant to the exception under subsection (2) of § 60-7-202, MCA, there was no evidence that the highway in question was fenced, and that the area adjacent to the highway was, as a matter of law, open range. *Indendi*, 272 Mont. at 69-70, 899 P.2d at 1088-89.

¶83 After properly reaching this conclusion, and requiring a remand, we then moved into a negligence *per se* analysis based on Indendi's contention that the Workmans had not constructed a "legal fence" around their property in accordance with § 81-4-101, MCA. As explained by the Court, one of the key criteria for establishing a negligence *per se* claim based on the violation of a statute is that the statute was enacted to protect a specific class of persons, and the plaintiff is a member of that class. *See Indendi*, 272 Mont. at 72, 899 P.2d at 1090 (quoting negligence *per se* test from *VanLuchene v. State* (1990), 244 Mont.

397, 401, 797 P.2d 932, 935). We stated:

> It is apparent that the whole purpose for the legislature's requiring fences to be constructed in a certain manner is to insure, to the extent possible, that livestock not on open range are adequately confined and are not free to roam and to cause harm to persons and property or to breed with the livestock of others. *There could be no other purpose for that sort of legislation.*

*Indendi*, 272 Mont. at 72, 899 P.2d at 1090 (emphasis added). Based on this assumption, we then stated that "it is reasonable to conclude that the legislature . . . recognizes the reality that one of the purposes of a legal fence is to keep livestock off the roadways of this state." Indendi, 272 Mont. at 72, 899 P.2d at 1090 (addressing § 81-4-102, MCA, a 1933 amendment, which allows a cattle guard exemption to the legal fence requirement of § 81-4-101, MCA). But see Ambrogini, 197 Mont. at 118, 642 P.2d at 1017 (stating that § 81-4-102, MCA, merely provides that an auto pass will not make an otherwise legal fence illegal). We reasoned that because "§ 81-4-101, MCA, was enacted to require the containment of livestock by means of a 'legal fence' and, thereby, to prevent, among other harm, livestock/vehicle accidents, Indendi presented evidence that the Workmans violated the statute by failing to construct a legal fence." Indendi, 272 Mont. at 73, 899 P.2d at 1090.

¶84 As addressed above, the purpose of the legal fence statutes, as indicated by § 81-4-215, MCA, was to *exclude* not *confine* livestock, and applies strictly to the legal relationship between livestock owners and landowners who wish to establish the condition precedent necessary to sustain a trespass action. Based on a clearly erroneous premise, we again substituted our judgment for that of the Legislature by inserting a statutory duty that simply did not exist, and by further establishing that the legal fence statutes established motorists as a "class of person" that the statutes supposedly were enacted to protect.

¶85 Thus, we conclude that § 80-4-101, MCA, which defines a "legal fence," and §§ 80-4-103 and 104, MCA, which establish liability for defective fences, do not mandate any statutory duty on the part of livestock owners in this state to "fence-in" their animals or otherwise maintain fences, and thus overrule *Indendi v. Workman* to the extent it holds that a violation of § 80-4-101, MCA, may serve as a basis for a finding of negligence *per se* with regard to an injury to a motorist or passenger traveling on a highway. Thus, Larson-Murphy's argument to the District Court and here that Zancanella's fence, which the Steiners were obligated to maintain, was "legally defective" due to the fact it violated the "legal fence statute" is without merit.

### V. Livestock owner's common law duty to highway users

¶86 Seemingly at odds with the historical common law trespass rule--that an owner of livestock is strictly liable for damages caused to another landowner--is the companion historical common law rule that on a highway, an animal is not a trespasser, and therefore there is no strict liability for any harm which it may cause to other highway users. Under the common law, as expressed by the House of Lords in a comprehensive 1947 decision:

> An underlying principle of the law of the highway is that all those lawfully using the highway, or land adjacent to it, must show mutual respect and forbearance. The motorists must put up with the farmer's cattle: the farmer must endure the motorist.

*Searle v. Wallbank [1947] 1 L.R.App.Cas. 341, 361 (L. du Parcq, concurring). See also Andes, 56 Mont.L.Rev. at 492 (discussing "public ways" exception); Prosser & Keeton, § 76 (stating that on the highway itself, "even an escaped animal is not a trespasser, and there is no strict liability for any harm which it may do upon that basis"); Kendall v. Curl (Or. 1960), 353 P.2d 227, 230 (citing Searle). The common law exception to this rule involved cases only where the animal was known by the owner to have a dangerous propensity or trait that was not characteristic of a domestic animal of like kind. See Prosser & Keeton, § 76.*

¶87 Thus, at common law, on the one hand a livestock owner may have a legal duty to restrain his livestock to prevent harm to his neighbor's crops, but has no similar duty to restrain his livestock to prevent them from "using" a highway--even though the animal may have escaped the very restraint intended to prevent harm to the neighbor. This apparent contradiction is reconciled by the historical context of the common law as it developed: neither cost-efficient fencing such as barbed wire, nor motor vehicles were a feature of rural England prior to the 20th century. The rural road system, in fact, developed in correlation to markets where livestock were routinely herded, and a rural traveler's common mode of transportation was either on foot or by horse. *See generally Searle*, 1 L.R.App.Cas. at 345-353.

¶88 The foregoing "mutual respect and forbearance" rule of common law was never codified in Montana under its open range doctrine statutes, nor has it been expressed, or referenced to, or in any clear manner discussed by our Legislature or this Court in the context of the legal relationship and duties between livestock owners and motorists on Montana highways.

¶89 In contrast, other western states' legislatures have clearly adopted and incorporated this common law rule into their respective open range doctrines. *See* Idaho Code § 25-

2118 (stating that "[n]o person owning, or controlling the possession of, any domestic animal running on open range, shall have the duty to keep such animal off any highway on such range, and shall not be liable for damage to any vehicle or for injury to any person riding therein, caused by a collision between the vehicle and the animal"); Nev. Rev. Stat. § 568.360(1) (stating that "[n]o person, firm or corporation owning, controlling or in possession of any domestic animal running on open range has the duty to keep the animal off any highway traversing or located on the open range, and no such person, firm or corporation is liable for damages to any property or for injury to any person caused by any collision between a motor vehicle and the animal occurring on such a highway"); N.M. State. Ann. § 66-7-363(C) (providing that "[o]wners of livestock ranging in pastures through which unfenced roads or highways pass shall not be liable for damages by reason of injury or damage to persons or property occasioned by collisions of vehicles using said roads and highways and livestock or animals ranging in said pastures unless such owner of livestock is guilty of specific negligence other than allowing his animals to range in said pasture").

¶90 Our Legislature, meanwhile, has only incidentally modified the concept of the common law "public way" rule by restricting certain kinds of animals from running at large in certain areas that include highways, and from restricting animals from certain kinds of highways. Thus, we have no express statutory affirmation or modification or complete abrogation of the common law rule governing the legal relationship between livestock owners and motorists as equal, lawful users of highways in Montana.

¶91 As previously addressed, in Montana, pursuant to § 1-1-108, MCA, where the law is not declared by statute, the common law shall be the law and rule of the decision. We have also held that the term "common law" also means "that body of jurisprudence as applied and modified by the courts of this country up to the time it became a rule of decision in this commonwealth." *Aetna Accident & Liab. Co. v. Miller* (1918), 54 Mont. 377, 382, 170 P. 760. Furthermore, in *Nehring v. LaCounte*, (1986), 219 Mont. 462, 712 P.2d 1329, we declared that where "[c]urrent conditions in Montana are such that the literal application of the common law rule has become unjust," we may judicially adopt a standard against which negligence or due care can be measured. *See Nehring*, 219 Mont. at 469, 712 P.2d at 1334 (citing statutory maxim under § 1-3-201, MCA, that "[w]hen the reasons of a rule ceases, so should the rule itself").

¶92 Thus, we first turn to § 27-1-701, MCA, encoded in 1895, which provides the general standard against which negligence or due care can be measured:

Except as otherwise provided by law, everyone is responsible not only for the results of his willful acts but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person except so far as the latter has willfully or by want of ordinary care brought the injury upon himself.

Further, our Legislature (also in 1895) has provided that "[e]very person is bound, without contract, to abstain from injuring the person or property of another or infringing upon any of his rights." *See* § 28-1-201, MCA. In the absence of an express statute, it is from these foregoing general rules that the duty in this instant case must be derived.

¶93 With these general principles in mind, we next observe that we need not judicially adopt an entirely new standard to meet the current conditions. Rather, our case law already provides that where two parties have an equal right to use a public highway, each must use it so as not to injuriously interfere with the other's right, and each must exercise a degree of care commensurate with the danger of the agency that he himself is using. *See Franck v. Hudson* (1962), 140 Mont. 480, 484-85, 373 P.2d 951, 953; *Sztaba v. Great Northern Ry. Co.* (1966), 147 Mont. 185, 197, 411 P.2d 379, 386, *overruled in party by Kyriss v. State* (1985), 218 Mont. 162, 707 P.2d 5; *Hightower v. Alley* (1957), 132 Mont. 349, 355, 318 P.2d 243, 247; *Fulton v. Chouteau County Farmers' Co.* (1934), 98 Mont. 48, 64, 37 P.2d 1025, 1029-30. *See also* § 1-3-205, MCA (stating maxim that one must so use his own rights as not to infringe upon the rights of another).

¶94 The roots of the foregoing rule in Montana can be traced to the mid-1800s common law in this country that existed at the time Montana became a Territory. *See*, *e.g.*, *Warner v. New York Cent. R.R. Co.* (N.Y.App.Div. 1866), 45 Barb. 299, *rev'd on other grounds* (1871), 44 N.Y. 465 (stating that "[i]t is not a question of superior, or subordinate right, in passing, which arises in an action for damages occasioned by a collision between a locomotive on the railroad and a vehicle upon the highway, but a question merely of the exercise of suitable caution and prudence, by either party in the exercise of a common and equal right); *Bradley v. Boston & M.R. Co.* (Mass. 1848), 2 Cush. 539 (concluding that the defendants had "a right to run their engines on the road at all times, for all suitable and proper purposes, using proper care not to interfere with the equal right of travelers to use the road crossed"); *Potter v. Pettis* (R.I. 1853), 2 R.I. 483 (concluding that the plaintiff and defendant had each an equal right to the river as a navigable highway, and when one was in the lawful use of it, the other should have yielded).

¶95 In *Franck*, a case involving a collision between a plaintiff's logging truck and a

defendant's cattle, this Court approved of a jury instruction which provided that "[w]here two parties have an equal right to use a public highway, each must use it so as not to injuriously interfere with the other's right, and each must exercise a degree of care commensurate with the danger of the agency that he himself is using." *Franck*, 140 Mont. at 484-85, 373 P.2d at 953 (concluding that instructions "taken as a whole . . . adequately state the applicable law"). In *Sztaba* we concluded that "[b]oth the railroad and the motoring public have an equal right to the use of a crossing." *Sztaba*, 147 Mont. at 197, 411 P.2d at 386. In *Hightower*, we likewise concluded that in Montana, a pedestrian and a motorist have equal rights in the use of a public highway. *Hightower*, 132 Mont. at 355, 318 P.2d at 247 (stating that a pedestrian must use ordinary care for his own safety). Finally, in *Fulton*, we stated that this rule applies to all "other persons lawfully using the highway." *Fulton*, 98 Mont. at 64, 37 P.2d at 1030 (stating that the "driver of an automobile certainly, in case of a breakdown, a collision, or other accident, if he exercises reasonable care, may use the highway for the purpose of inspection, or repair in case his car is unable to proceed, or may render assistance to another on the highway").

¶96 Thus, because both a livestock owner and a motorist may have an equal right to lawfully occupy a highway in an "open range" area, or, to a limited extent, within a herd district under § 80-7-306, MCA, or designated state highway under § 60-7-201, MCA, we hold that both owe each other a legal duty to use such roads so as not to injuriously interfere with the other's right of use. Accordingly, ascertaining the precise standard of care each owes the other is a fact-driven question that must be viewed in light of the circumstances under which the harm occurs. *See Lopez v. Great Falls Pre-Release Services, Inc.*, 1999 MT 199, ¶¶ 27-28, 295 Mont. 416, ¶¶ 27-28, 986 P.2d 1081, ¶¶ 27-28; *Ambrogini*, 197 Mont. at 120, 642 P.2d at 1019 (stating that reasonableness of livestock owner was for jury to decide).

¶97 Obviously, in Montana such a determination involves a broad spectrum of circumstances. As observed by *amici*, "open range" encompasses remote, seldom traveled unpaved highways where no fences at all restrain livestock, as well as heavily fenced areas traversed by high levels of traffic on paved roads near dense population centers where livestock customarily have no cause to be herded or otherwise occupy the highway for the purpose of grazing or seeking water.

¶98 Accordingly, the duty owed to motorists by an owner of a black Angus bull, which is standing in the middle of a highway at night in harm's way, conceivably may be no different than that owed by an owner of a vehicle who permits his or her vehicle to remain

in harm's way in the middle of the same highway, under the same circumstances. In both instances, each has a legal right to use the highway. Yet both must act in a reasonable manner under the circumstances, and failure to do so may constitute negligence on his or her part. *See*, *e.g.*, *Morton v. Mooney* (1934), 97 Mont. 1, 8, 33 P.2d 262, 264 (stating that if a car becomes disabled, "the motorist should employ due diligence to remove it from the highway within a reasonable time, but, in the absence of any showing of lack of diligence, the mere fact that a disabled car is standing on the highway does not constitute actionable negligence"). *See also Carrow v. Lusby* (Az. 1991), 804 P.2d 747, 754 (applying duty of ordinary care to livestock owners and stating that "in open range territory, the mere failure to prevent one's cattle from entering the highway, by erecting fences or otherwise, does not constitute conduct falling below the standard of care required of livestock owners"); *Shively v. Dye Creek Cattle Co.* (Cal.Ct.App. 1994), 35 Cal.Rptr.2d 238, 244 (applying duty of ordinary care to livestock owners and stating that "against the backdrop of the 'open range' law, the duty of ordinary care in this context does not contemplate extreme preventive measures").

¶99 In accordance with the foregoing we now turn, at last, to the issues raised by the parties.

## VI. Issues presented

### 1. Did the District Court err in granting summary judgment to Zancanella?

¶100 The District Court, in its January 6, 1997 Order, dismissed Zancanella from the action based on the conclusion that he did not have the duty to either keep the Steiners' bull off the highway in question, or maintain any fence on the property leased to the Steiners.

¶101 Larson-Murphy's argument on appeal rests primarily on the contention that Zancanella had a non-delegable statutory duty to maintain the fences on the property leased to the Steiners, notwithstanding the lease agreement. As discussed above, Zancanella had no statutory duty to maintain a legal fence, pursuant to § 81-4-101, MCA, and therefore this argument must fail.

¶102 Moving to a common-law theory, however, Larson-Murphy further relies on *Fagan v. Silver* (1920), 57 Mont. 427, 188 P. 900, for the proposition that a lessor and lessee may both be liable for damages resulting from maintaining a "nuisance or hazard," and that,

generally, lessors under certain circumstances may be liable for damages suffered by a third party that result from the lessee's activities. Contrary to the District Court, which did not actually cite authority for its conclusions, we find merit in this argument to the extent that material facts related to this theory remain in dispute.

¶103 Zancanella is correct that a lessor of land usually has no control over the conduct of the lessee or the person upon the leased land while the lessee is in possession of it. Therefore, the traditional common law rule has been that the lessor is under no obligation to anyone to look after the premises or to keep them in repair, and is not responsible, either to persons injured on or off the land for conditions which develop or are created by the tenant after possession has been transferred. *See Prosser & Keeton*, § 63; *Parrish v. Witt* (1976), 171 Mont. 101, 104, 555 P.2d 741, 743 (requiring plaintiff to show that exception to general rule); *Lake v. Emigh* (1948), 121 Mont. 87, 119-20, 190 P.2d 550, 566 (stating general rule that in the "absence of an agreement in the lease binding the landlord to put or keep the premises in repair, he is not liable in damages for failure to do so or for injuries sustained by the tenant by reason thereof") (citations omitted).

¶104 Two relevant exceptions to the foregoing general rule, to which Larson-Murphy's argument alludes, are expressed under two, related sections of the Restatement (Second) of Torts §§ 379A and 837, which we conclude are persuasive authority in this instance. Section 379A provides that a lessor of land is subject to liability for physical harm to persons outside of the land caused by activities of the lessee or others on the land after the lessor transfers possession if, but only if:

> (a) the lessor at the time of the lease consented to such activity or knew that it would be carried on, and

> (b) the lessor knew or had reason to know that it would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken.

Restatement (Second) of Torts, § 379A (1965). Similarly, § 837 provides that a lessor of land is subject to liability for a nuisance caused by an activity carried upon the land while the lease continues and the lessor continues as owner, if the lessor would be liable if he had carried on the activity himself; and

> (a) at the time of the lease the lessor consents to the activity or knows or has reason to know that it will be carried on, and

(b) he then knows or should know that it will necessarily involve or is already causing the nuisance.

Restatement (Second) of Torts § 837 (1979). *See also* Restatement (Second) of Property, *Landlord & Tenant* § 18.4 (1977) (providing substantially the same rule as § 379A). These Restatement sections and interpretive case law suggest that where, for example, a land owner abutting a public highway leases the property knowing it will be used for a potentially hazardous purpose, and as a result a traveler on the highway is injured, the owner may be subject to liability. *See* Restatement (Second) of Torts § 379A, comment c; *Park v. Hoffard* (Or. 1993), 847 P.2d 852, 855-56 (holding that landlord may be liable for damage caused by tenant's dog); *Klimkowski v. De La Torre* (Ariz.Ct.App. 1993), 857 P.2d 392, 395 (holding that if landlord has knowledge of nuisance, and has opportunity to reenter and abate the nuisance, he may be held liable if a third party suffers damage as a result of the nuisance); *Easson v. Wagner* (S.D. 1993), 501 N.W.2d 348, 351 (stating that a landlord may be held liable for damage to adjoining property occasioned by a tenant's use of the property that was sanctioned by the landlord, pursuant to negligent leasing theory); *Walker v. Everist, Inc.* (N.M.Ct.App. 1985), 701 P.2d 382, 387 (providing rule that if the potential harm is sufficiently substantial and predictable, it is the duty of the lessor to abate the nuisance created by his lessee).

¶105 Further, our decision in *Criswell v. Brewer* (1987), 228 Mont. 143, 741 P.2d 418, upon which Zancanella relies, can be distinguished from the facts here. In that case, we concluded that the owner of a ranch could not be liable for the ranch foreman's dog that bit a third party, concluding that the ranch owner was not a "keeper" of the dog. We nevertheless concluded that the ranch owner must still exercise reasonable care as a landowner. The facts indicated that the dog had bitten someone approximately two years before the incident with the plaintiff, the ranch owner was aware of the earlier biting, and had satisfied his duty of reasonable care by providing materials to the dog's owner to build a fence and dog pen behind the ranch house, and requiring that the foreman keep the dog in the pen unless accompanied by the foreman. *See Criswell*, 228 Mont. at 144, 741 P.2d at 419.

¶106 Thus, the claim of negligence against Zancanella gives rise to two questions of fact: whether he knew of, or consented to, the tenant's activity which caused the harm and whether he realized the risks associated with that activity. If the expected activity under the lease resulted in a reasonably anticipated injury, the landlord cannot disclaim liability. *See Easson*, 501 N.W.2d at 351 (relying on Restatement (Second) of Property, § 18.4 and

Restatement (Second) of Torts, § 379A).

¶107 The facts here indicate that Zancanella understood and consented that livestock, including bulls, would be kept by his lessees, the Steiners, and consequently it was a condition of the lease that they maintain the fences, and take whatever precautions were necessary for keeping such animals. Obviously, Zancanella was aware of the potential risks involved, having kept livestock, including a bull, on the property in the mid-1970s. Further, in anticipation of any damages the livestock may cause, he required that the Steiners carry liability insurance.

¶108 While such contractual obligations may give Zancanella a right to indemnification from the Steiners, we conclude that an injured third party, such as Larson-Murphy, is not a party to such an agreement, and thus Zancanella cannot avoid liability if a legal duty was owed. *See* Restatement (Second) of Torts, § 379A, comment d. Further, the facts are unclear, and therefore in dispute, as to what degree Zancanella exercised reasonable care in addressing whether this activity on his property would pose a risk to users of the adjacent roads. Zancanella's argument here, in fact, is premised on the notion that he owed no duty of care under any circumstances, and this assertion formed the basis of the District Court's conclusion. Unless all material facts undisputedly show that Zancanella fully satisfied his duty of ordinary care under the circumstances as an owner and lessor of the premises, summary judgment in his favor is improper. Accordingly, the District Court's order dismissing Zancanella from the action is reversed.

## 2. Did the District Court err in denying summary judgment to the Steiners?

¶109 The District Court denied the Steiners' motion for summary judgment on two separate occasions, and a motion for reconsideration, all of which address similar issues of law.

¶110 In the District Court's October 29, 1996 Order, the court determined that "[i]f an area is not open range, there is a duty to maintain legal fences and keep livestock off the roadways," pursuant to *Indendi v. Workman* (1995), 272 Mont. 64, 899 P.2d 1085, and § 60-7-102, MCA. The court stated that whether "Defendants violated the legal fencing statute, and whether such a violation constitutes negligence *per se* are questions of fact." The court concluded that the defendants "failed to establish they lacked a duty to maintain legal fences and keep livestock off Hoskin road."

¶111 Pursuant to our discussion here, we conclude that the denial of the defendants' motion for summary judgment was proper. Although the Steiners had no duty to maintain a legal fence, pursuant to § 81-4-201, MCA, they nevertheless had a common law duty to exercise control of their livestock to a particular standard of conduct in order to protect motorists, as foreseeable plaintiffs, against unreasonable risks of harm under the circumstances--whether within a herd district or on open range. *See* § 27-1-701, MCA.

¶112 It is undisputed that the accident occurred within a herd district, which was in effect at the time. Therefore, the Steiners' bull, which was "at large," was not lawfully occupying the highway at the time of the accident, because the highway in question was not "open range." Thus, the question of what was a reasonable standard of care under the circumstances--where an animal escapes an owner's premises in a herd district--is a fact-specific inquiry. As the court acknowledged "disputed issues of material fact remain." Namely, those facts pertaining to how the bull escaped from the premises, and what steps the Steiners had taken, or should have taken, in light of the risk involved, remained in dispute at the time the court rendered its decision.

¶113 The District Court's January 6, 1997 Order denying the Steiners' motion to reconsider is affirmed under the same rationale.

¶114 Finally, the District Court's November 19, 1997 Order again turned on the legal question of whether the accident occurred in open range, and thus whether or not the Steiners owed a legal duty to Larson-Murphy. The court concluded that the accident did not occur in open range. We affirm this conclusion. Ultimately, the court's denial of the Steiners' motion turned on the disputed fact of which fence was relevant: the triangular pasture where the Steiners placed the bull, or the perimeter fence near Hoskin Road.

¶115 Disregarding questions of law, we again affirm the order denying the Steiners' motion for summary judgment. Obviously, material facts regarding which fence was or was not properly maintained, the condition of the gates on the property, and how these conditions relate to the reasonable care required in preventing a black bull from obstructing a highway at night in a herd district remained in dispute at the time of the court's decision.

### 3. Did the District Court properly grant the Steiners' motion for a directed verdict?

¶116 Pursuant to our standard of review, we consider only the evidence introduced by the party against whom the directed verdict is granted. If that evidence, when viewed in a light most favorable to the party, tends to establish the case made by the party's pleading, we will reverse the directed verdict.

¶117 Here, Larson-Murphy's theory for recovery is that the Steiners were negligent. This theory can be summarized as follows: (1) at some point in the chain of events leading up to the collision of Larson-Murphy's vehicle with the Steiners' bull on May 8, 1993, the Steiners--as well as Zancanella--owed a legal duty to motorists on Hoskin Road to prevent in some manner the bull from obstructing the county highway; (2) the Defendants breached this duty when their conduct fell below a recognized standard of care under the circumstances; (3) this breach of a legal duty caused the accident; and (4) as a result, Larson-Murphy was damaged. *See generally Nehring*, 219 Mont. at 469, 712 P.2d at 1334.

¶118 Thus, potentially, if the Steiners acted unreasonably in failing to guard against the risk that their bull could obstruct and interfere with Larson-Murphy's lawful use of Hoskin Road, they may be liable for negligence. We conclude that Larson-Murphy presented sufficient evidence at trial that the Steiners' bull unlawfully obstructed Hoskin Road and caused the accident resulting in her damages, and that its escape arguably resulted from a lack of reasonable care by its owners.

¶119 Clearly, therefore, reasonable persons could draw different conclusions from the evidence concerning whether the Steiners' standard of care was reasonable under the circumstances. The trier of fact should have been permitted to make this ultimate determination, and, accordingly, the directed verdict in favor of the Steiners is reversed.

¶120 Therefore, this action is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ W. WILLIAM LEAPHART

/S/ JOHN C. McKEON

District Judge, sitting for

Justice Jim Regnier

Justice Terry N. Trieweiler concurring.

¶121 I concur with the majority opinion, except for that part which reversed the holding in *Indendi v. Workmen* (1995), 272 Mont. 64, 899 P.2d 1085, that violation of Montana's legal fencing requirements found at § 81-4-101 is negligence per se in the context of a livestock-motor vehicle collision.

¶122 The majority concludes that violation of the legal fence requirement was not negligent per se in the context of a livestock-motor vehicle collision because motor vehicle operators are not members of the class for which the legal fence requirement was enacted. I disagree and conclude that the majority's interpretation of the statute's purpose is far too narrow. Plaintiffs were within the class of persons that legal fencing requirements were enacted to protect because they are victims of cattle roaming in an area where it is required that they be contained. It is not necessary that the legislature foresee every manner in which prohibited acts or omissions could cause injury before negligence as a matter of law can be found.

¶123 As stated in *Indendi*, the broad purpose of the legal fence requirement is to assure that livestock are " . . . not free to roam and to cause harm to persons and property or to breed with livestock of others." *Indendi*, 272 Mont. at 72, 899 P.2d at 1090. I do not believe it was necessary for the legislature to foresee each specific type of harm that wandering livestock could cause before principles of negligence per se are applicable.

¶124 The majority's sweeping conclusion that legal fences were only required to keep livestock out rather than to keep livestock in is discredited by other provisions found in Title 81, Chapter 4, Part 1. For example, § 81-4-103, MCA, provides:

> Any person constructing or maintaining any fence of any kind not described in 81-4-101 is liable in a civil action for all damages caused by reason of injury to stock resulting from such defective fence.

¶125 Section 81-4-104, MCA, provides that owners of barbed wire fences which are in disrepair are liable to owners of livestock injured thereby, when after notice, the fence is not repaired. Furthermore, Part 2 provides penalties and civil liability when prohibited

animals are permitted to run at large. Section 81-4-202, MCA. Part 3 provides penalties for persons who allow livestock to run at large in a herd district. Section 81-4-306, MCA. These statutes, when read together, clearly suggest that the legal fencing requirement was intended for more than to protect fenced land from roaming livestock. The fencing requirements were also obviously enacted to protect others from livestock which by law, must be contained. That includes cattle found in herd districts.

¶126 I would conclude that to start limiting the laws protection from roaming livestock to only certain classes of tort victims without an expressed intention by the legislature to do so, is far too narrow an application of the legal fencing requirement. For these reasons, I would follow that part of the *Indendi* decision which held that in the context of livestock/ motor vehicle collisions, failure to provide a legal fence is negligence per se and I dissent from the majority's decision to reverse that part of the *Indendi* holding.

/S/ TERRY N. TRIEWEILER

Justice William E. Hunt, Sr., joins in the foregoing concurring opinion.

/S/ WILLIAM E. HUNT, SR.

Justice Karla M. Gray, dissenting.

¶127 I respectfully dissent from the Court's scholarly and sweeping decision which abrogates decades of precedent and fails to take into account that the Legislature, like the livestock owners of Montana, have long relied on that precedent. While I do agree with some of the Court's discussion, my disagreements are extensive. Rather than have the opinions in this case fill an entire volume of *Montana Reports*, however, I will address only major points.

¶128 Regarding points of agreement between myself and the Court, I agree with the Court's early conclusions that the law of the open range remains the law of this state and that the term open range includes all highways outside of private enclosures and used by the public, unless modified by the Legislature. I also agree we correctly held in *Williams* that the herd district statutes were intended only to protect landowners and owners of livestock. Finally, I agree that, while the portions of *Indendi* analyzing and resolving the questions at issue pursuant §§ 60-7-201 and 60-7-202, MCA, were correct, the negligence *per se* discussion and holding therein must be overruled because the legal fence statutes

were enacted to exclude, not confine, livestock.

¶129 I disagree with and, therefore, dissent from most of the rest of the Court's opinion, with regard to its approach, its discussion and its result. In particular, I strenuously disagree with the Court's statement in the early part of its Discussion that "[t]his case involves a general misconception of the import of Montana's 'open range doctrine' in matters involving the legal relationship between the owners of livestock and users of motor vehicles on Montana highways." Under decades of Montana law, there is no "misconception," since that law has clearly held for decades that-absent an exception enacted by the Legislature-an owner of livestock has no duty to prevent the livestock from wandering onto Montana highways. *See, e.g., Bartsch*, 149 Mont. at 409, 427 P.2d at 305; *Williams*, 235 Mont. at 141, 766 P.2d at 249. For the same reason, I cannot agree with the Court's statement soon thereafter that the District Court's expression of the "prevailing law" in Montana with regard to open range is "incorrect." The prevailing law was-at the time of the District Court's decision-and has been for decades as stated by that court. That this Court changes, in this case, the prevailing law by overruling decades of well-settled precedent does not support the Court's statement that the District Court erred under "prevailing law."

¶130 I also disagree with the Court's statement that open range and the open range doctrine has nothing to do with the legal relationship between livestock owners and motorists "under a theory of negligence." The fact is that, under our earlier cases on this subject, a negligence theory in such situations was available only under legislative exceptions to the open range doctrine. *See, e.g., Bartsch*, 149 Mont. at 409, 427 P.2d at 305; *Ambrogini*, 197 Mont. at 119-21, 642 P.2d at 1019-20.

¶131 Overall, my position is this: The Court sweeps away decades of precedent by characterizing our statements of law in those cases that an owner of livestock has no duty to prevent the livestock from wandering on the highways as mere "assumptions." Such a cavalier approach to the legal determinations of Montana's highest court is inappropriate and is, in my view, an insufficient starting point to overrule a body of decisions which stated the rule of law on this subject in Montana for decades and provided the stability and predictability in the law which is so necessary in an ordered society.

¶132 Moreover, the Court fails to notice what, to me, is the clear tie between our cases and the Legislature's reliance on-and response to-those cases; in doing so, the Court undercuts the Legislature's lawmaking authority on this subject. The fact is that our 1967 *Bartsch*

decision addressed the livestock-motorist dilemma at a time when the only statutory duty imposed on livestock owners with regard to livestock on highways was for willfully or intentionally allowing livestock onto certain highways. There, we stated without equivocation that

> in open range country, the owner of livestock . . . has no duty to prevent the livestock from wandering. Since he has no duty to prevent such wandering, he cannot be said to be negligent if the livestock do wander--even if such wandering takes them onto a highway right of way which runs through the open range.

*Bartsch, 149 Mont. at 409, 427 P.2d at 305. Recognizing the propriety of the result, but concerned about increased motor traffic in the last third of the twentieth century, Justice John C. Harrison specially concurred, urging the Legislature to give the subject its "utmost consideration." Bartsch, 149 Mont. at 410, 427 P.2d at 305 (Harrison, J., concurring).*

¶133 The Legislature heeded Justice Harrison's plea in the very next legislative session by enacting statutes relating to the subject. *See* 1969 Mont. Laws Ch. 311, Sec. 1. The Legislature acted again in 1974, more vigorously, by enacting what subsequently became § 60-7-101, MCA, the "Purpose" statement that §§ 60-7-101 through 60-7-103, MCA, were expressly intended

> to balance the tradition of the open range and the economic and geographic problems of raising livestock with the need for safer highways and the policy of taking all feasible measures to reduce the high incidence of traffic accidents and fatalities on Montana highways.

*See 1974 Mont. Laws Ch. 255, Sec. 1. In a separate bill, the Legislature also amended other statutes on the subject. Of special note, it amended the statute referenced in Bartsch-which previously had imposed a duty only for willfully or intentionally allowing livestock on certain highways-to provide that the livestock owner "may not permit" occupation of certain highways by livestock. See 1974 Mont. Laws Ch. 316, Sec. 7. On the basis of this last legislative amendment, we properly decided in Ambrogini that livestock owners in Montana could be found liable for merely negligent-rather than willful-conduct which results in the presence of their cattle on certain highways designated by the Legislature. Ambrogini, 197 Mont. at 120, 642 P.2d at 1018.*

¶134 It is my view that Title 60, Chapter 7 clearly expresses the Legislature's intent in balancing the modern dilemma of livestock in an open range state with the competing concerns for motorist safety. Certain duties have been imposed on the state of Montana and on livestock owners via those statutes and it is my view that the statutes set the only parameters within which a motorist or passenger may sue a livestock owner for negligently allowing livestock on the designated highways. The facts of the present case do not fall within those parameters.

¶135 The Legislature having done the balancing it found necessary and appropriate, and having done so in response to *Bartsch*, there is simply no basis for the Court to extend and expand that careful legislative balancing--via application of § 27-1-701, MCA-to apply to circumstances the Legislature clearly did not intend to bring within its purview. In short, it is my view that, in enacting Title 60, Chapter 7, the Legislature set forth-as the public policy of this state-the only exceptions to the open range-no duty doctrine available for livestock-vehicle collisions. Our job is not to decide whether we agree with the Legislature's actions; our job is to " 'construe and apply the law as [we] find it and to maintain its integrity as it has been written by a coordinate branch of the state government.' " *Raffety v. Kanta Products, Inc.* (1991), 250 Mont. 268, 272, 819 P.2d 1272, 1275 (citation omitted). It is undisputed in the present case that the collision occurred on a county road not included within the statutory exceptions to the open range doctrine set forth by the Legislature.

¶136 Furthermore, while the Court's conclusory statement that the herd district statutes authorize certain landowners "to exempt a particular area of land from the open range" is not altogether incorrect, I disagree that the herd district statutes impact on livestock-motor vehicle collisions on county roads. As a result, I also disagree with the Court's conclusion that, because the accident at issue here occurred *within* a herd district, it did not occur within the open range.

¶137 The problem with the Court's reasoning in this regard is that herd districts are created by *owners* of *land* and the penalties for permitting animals to run at large or trespass apply only "within a herd district." *See* §§ 81-4-301, 81-4-306 and 81-4-307, MCA. Herd districts do not include county roads adjacent thereto and, therefore, a livestock-motor vehicle collision on such a county road simply does not occur *within* the herd district. Consequently, the Court's early conclusion that open range "includes all highways outside of private enclosures and used by the public" unless modified by the Legislature-a conclusion with which I heartily agree-remains applicable here and no duty arises.

¶138 In summary, I simply cannot agree with the Court's decision to apply § 27-1-701, MCA, to the circumstances before us here. The open range-no duty rule and the statutory duty of ordinary care have coexisted-but been separately applied-in Montana for 100 years or more. In both cases, the Legislature has enacted exceptions to the general rules and this Court has applied such statutory exceptions to the cases before it (absent constitutional infirmity). Nothing in this case persuades me that a change in course, especially one by this Court that necessitates turning decades of well-settled law and carefully crafted actions by the Legislature on their head, is either appropriate or necessary. I dissent from the Court's decision to do so.

¶139 As a final matter, I turn to the issues stated in-and discussed at the very end of-the Court's opinion. I dissent from the Court's resolution of issue one, which reverses the District Court's dismissal of Zancanella from the action. I do agree with the Court that Larson-Murphy's reliance on the fencing statute and *Indendi* in this regard-which constitutes the bulk of her argument on this issue-is misplaced. The only other authority relied on by Larson-Murphy is *Fagan* and the Court properly does not rely on that case to reverse the trial court's dismissal of Zancanella.

¶140 Indeed, the Court's decision on this issue is based primarily on a discussion of various portions of the Restatement (Second) of Torts, a discussion with which I do not disagree. My problem, however, is that Larson-Murphy's contentions on this issue are limited to the arguments set forth above. She did not argue Restatement law in support of her position. It is my view that our duty is to decide cases based on the issues and arguments raised by the parties, so each party has the opportunity to brief the matters raised and this Court can make a reasoned decision accordingly.

> While the temptation is often great to decide a case on the basis of the argument that "should have been made," but was not, in blind-siding an issue we run the very real risk of substituting advocacy for neutrality.

*State v. Zabawa (1996), 279 Mont. 307, 318, 928 P.2d 151, 158 (Nelson, J., concurring). Moreover, in relying on the Restatement (Second) of Torts, the Court shifts the thrust of Larson-Murphy's entire argument from the purported deficiency of the fence to the activity of the Steiners-about which Zancanella knew-of maintaining a bull on the property, with its concomitant risks. It is this sort of "slippery slope" along which it is easy to slide when the Court undertakes to resolve an issue based on an unraised argument.*

¶141 I also dissent from the Court's conclusion on the second issue that the District Court properly denied the Steiners' motion for summary judgment. For the reasons discussed above at some length, it is my view that the Steiners were entitled to summary judgment under the open range-no duty doctrine, in that no legislative exception to that doctrine applies here. Because Larson-Murphy's case against the Steiners should have ended with the grant of their motion for summary judgment, I would not separately address whether the District Court properly granted the Steiners' motion for a directed verdict.

¶142 In sum, while I agree with portions of the Court's discussion, I dissent from its overall approach and resolution of this case via the application of § 27-1-701, MCA. I would affirm the District Court's dismissal of Zancanella from the action and reverse the denial of the Steiners' motion for summary judgment.

/S/ KARLA M. GRAY

Chief Justice J. A. Turnage joins in the foregoing dissenting Opinion.

/S/ J. A. TURNAGE

1. Restatement (Second) of Torts § 291 provides that "[w]here an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done."

2. It should be noted that a lawful fence, under § 81-4-101(5), MCA, includes "all rivers, hedges, mountain ridges and bluffs, or other barriers over or through which it is impossible for stock to pass," in addition to the more common legally-defined barrier of barbed wire.

3. As originally codified, the open range definition meant all lands not enclosed by a lawful fence. This definition was changed in 1925, to the current two-wire standard. *See* Ch. 63, L. 1925. Thus, again in concert with the purpose of the open range doctrine, the fencing required to remove land from open range did not apply to livestock owners, who chose to restrain their animals, but to landowners who wished to exclude other persons livestock. *See also Siegfried v. Atchison* (1985), 219 Mont. 14, 17, 709 P.2d 1006, 1008

(concluding that the "presence of privately constructed fences along the highway right-of-way does not indicate the area is not open range").

4. This intentional conduct standard was a result of a 1925 amendment. Originally, livestock were flatly prohibited from running at large, with no mention of intent. *Compare* Ch. 74, L. 1917, *with* Ch. 45, L. 1925. For reasons that remain unclear, no similar willful standard was amended to the horse herd district statute, which does not require intentional conduct. *See* § 81-4-324, MCA.

5. In 1974, the Legislature charged the State with the duty of fencing certain highways. *See* § 60-7-101 through 103, MCA. The Legislature provided that the purpose of this duty was to "balance the tradition of the open range and the economic and geographic problems of raising livestock with the need for safer highways and the policy of taking all feasible measures to reduce the high incidence of traffic accidents and fatalities on Montana highways." *See* § 60-7-101, MCA. This pronouncement came, however, more than 20 years after the "grazing of livestock on highways" statutes were codified, and offers no express reference to §§ 60-7-201 through 205, MCA. Thus, it is unclear whether the Legislature intended this clear enunciation of "safer highways" policy to apply to the grazing statutes as well.